[No. C010485. Third Dist. Aug. 5, 1992.]

EVAN F., a Minor, etc., et al., Plaintiffs and Appellants, v.
HUGHSON UNITED METHODIST CHURCH et al., Defendants and
Respondents.

## Counsel

Bostwick & Tehin and Scott D. Righthand for Plaintiffs and Appellants.

Porter, Scott, Weibert & Delehant, Ned P. Telford, Lili G. Rehwald, Kristine M. Stampen, Longyear, O'Dea & Lavra and Van Longyear for Defendants and Respondents.

## OPINION

**DAVIS, J.**—This is a negligent hiring case arising from the employment of a pastor who sexually molested a child parishioner. Evan F. and his sister, Eyrene F., appeal from summary judgments in favor of the Hughson United Methodist Church and the California-Nevada Annual Conference of the United Methodist Church. We reverse the summary judgment regarding Evan's negligent hiring action against the Hughson Church. In all other respects, we affirm the judgments.

## BACKGROUND

The evidence presented in the motions for summary judgment and the responses thereto shows the following.

At the relevant times in this case, Hughson United Methodist Church (Hughson Church) was a local congregation that was a member of a larger organization called the California-Nevada Annual Conference of the United Methodist Church (Conference). Conference was comprised of many districts, each of which had a district superintendent.

In 1985, the pastor at Hughson Church, Duane Murphy, twice orally copulated Evan. Evan had just turned 13 years old when these incidents occurred. About two weeks after he was first molested by Murphy, Evan began a series of at least four sex acts with his younger sister Eyrene. These acts encompassed fondling, attempted oral copulation, and sexual intercourse; they occurred between late 1985 and May 1987, and began when Eyrene was six years old.

A child/adolescent psychiatrist and professor, Dr. Lenore Terr, opined that Evan sexually molested Eyrene because of his experience with Pastor Murphy. Dr. Terr explained that abused and molested children often abuse and molest others. She noted that Evan had not previously engaged in any child molestation behavior. Murphy's molestation of Evan, according to Dr. Terr, resulted in a premature sexual stimulation and awakening for Evan, who was then an early adolescent boy entering puberty. Dr. Terr specifically concluded that in molesting Eyrene, Evan reenacted his molestation experience of a larger person overpowering a smaller one. According to the doctor,

Eyrene was a foreseeable victim of Evan's "acting out," since Eyrene lived in the same house, was the only younger female and was considerably weaker than Evan.

There was evidence that Murphy had sexually molested adolescent males in the past. In 1971, Syd S., one of Murphy's parishioners, charged that he and Murphy had a long-standing homosexual relationship that apparently began when Syd was 13 years old. The then district superintendent, Donald Getty, learned of these allegations and was convinced of their veracity. In 1971 or 1972, Conference advised Murphy that if he agreed to "step down" from the ministry, neither Syd nor the Conference would formally pursue charges. In this way, Murphy would retain his ordination. Murphy agreed to this resolution.

From the time he "stepped down" until 1977, Murphy apparently remained away from church activities. During this time, he began working as a counselor at a secular high school. Around 1977, Murphy approached Hughson Church and asked to be appointed to the youth director position the church was creating. In appointing Murphy youth director, Hughson Church apparently relied on the facts that Murphy was a Methodist minister, and that several people in the parish knew and recommended him. The church also knew that Murphy worked as a counselor at a public high school. While serving as youth director, Murphy continued working as a counselor.

Around 1982 the pastor at Hughson Church retired and Murphy sought the position. Under the relevant hiring procedure, Conference selects the pastor for a local congregation after the district superintendent investigates candidates and consults with the local church's committee on pastor/parish relations. Once the Conference makes its selection, the pastor/parish relations committee (Committee) may approve or disapprove the appointment.

In seeking the pastor position, Murphy informed the Committee he was no longer employed as a school counselor and could return to the ministry full time. He asked for the Committee's support. With but one dissent (from Evan's father), the Committee agreed to support Murphy if he was "reinstated, permitted to return to the full-time ministry." According to the district superintendent at the time, William Dew, Hughson Church requested that Murphy be appointed pastor.

At the time Conference selected Murphy as pastor, it had information that he had been fired from his counselor position because of charges involving inappropriate behavior with an adolescent male. In fact, Dew had been contacted by authorities in 1980 or 1981 and told that Murphy was being

investigated for an inappropriate relationship with a schoolboy staying in Murphy's home without his parents' knowledge. Murphy told Dew this matter involved allowing a potential runaway to stay in his home. Dew did not investigate the matter any further. It was Donald Getty's understanding (the past superintendent) that Dew also knew at this time of the Syd S. charges.

Neither the Conference nor Dew informed Hughson Church or the Committee of these matters. However, the Committee apparently was aware there was some difficulty with Murphy's reappointment to the active ministry. The Committee understood that Murphy had been on sabbatical and that he had specifically requested reappointment only if he could be assigned to Hughson Church.

Murphy was Evan's Sunday school teacher in 1985 and 1986. Evan and his younger brother, Eren, were often the only students in this class. On several occasions in class, Murphy discussed sex with the boys. Around the fall of 1985, when Evan had just turned 13 years old, Murphy invited Evan and Eren to his home on several occasions. On two separate occasions, after giving Evan wine and having him sit nude in a hot tub, Murphy orally copulated Evan while Eren watched television inside the house.

It was about two weeks after the first molestation by Murphy that Evan began the series of at least four sex acts described earlier with his six-year-old sister, Eyrene.

Based on his molestations of Evan, Murphy was convicted of two counts of committing lewd acts with a child under the age of 14. (Pen. Code, § 288, subd.(a).) This court affirmed the conviction in an unpublished opinion filed November 21, 1990 (3 Crim. C005466).

In 1990, Evan, Eyrene and their parents sued the Conference, Hughson Church, Murphy and Dew. The cornerstone of the suit—at least as it pertains to Conference and Hughson Church—is a cause of action for the negligent hiring of Murphy. There was also a cause of action for negligent misrepresentation of Murphy's pedophile history. Negligence and negligent infliction of emotional distress were also alleged; these claims arose out of the molestations themselves and the defendants' counseling of and ministry to all plaintiffs.

On the motions for summary judgment, the trial court ruled that the parents' causes of actions were time-barred. The court determined that Eyrene could not recover from Conference, Dew or Murphy; it did so on the

basis that Eyrene's injury was not the proximate result of the defendants' conduct because "considerations of policy limit the defendants' liability for the consequences of their conduct." Finally, the court granted summary judgment for Hughson Church against all plaintiffs because the church had no actual knowledge of Murphy's sexual history.

This appeal concerns only the liability of Conference and Hughson Church regarding Eyrene and the liability of Hughson Church regarding Evan. There are two basic issues: (1) Can Eyrene proceed to trial against Conference for negligent hiring and negligent infliction of emotional distress? and (2) Can Eyrene and Evan proceed against Hughson Church? We conclude that Eyrene cannot proceed against Conference or Hughson Church, but that Evan can proceed against Hughson Church on a negligent hiring theory. Consequently, we affirm the summary judgment regarding Eyrene but reverse the summary judgment regarding Evan on his negligent hiring cause of action against Hughson Church.

## DISCUSSION

### 1. *Eyrene Against Conference*

We first examine whether Eyrene can proceed against Conference for negligent hiring and negligent infliction of emotional distress. These issues involve essentially undisputed facts and present questions of law as to whether these causes of action against Conference are legally tenable. The resolution of these issues is appropriate in the summary judgment context. (See *Burke Concrete Accessories, Inc.* v. *Superior Court* (1970) 8 Cal.App.3d 773, 774-775 [87 Cal.Rptr. 619].)

The elements of a cause of action for negligence are well established. They are "(a) a *legal duty* to use due care; (b) a *breach* of such legal duty; [and] (c) the breach as the *proximate or legal cause* of the resulting injury." (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 732, pp. 60-61 and cases cited therein; italics in original.) Eyrene's action for negligent hiring against Conference invokes certain policy concerns regarding the limits of liability. (See Prosser & Keeton on Torts (5th ed. 1984) §§ 41-42, pp. 264, 272-273; *Mosley* v. *Arden Farms Co.* (1945) 26 Cal.2d 213, 220-223 [157 P.2d 372] (conc. opn. of Traynor, J.); *Maupin* v. *Widling* (1987) 192 Cal.App.3d 568, 573-574 [237 Cal.Rptr. 521].) For that reason, we think the trial court appropriately analyzed this action in the context of the policy considerations component of proximate cause.

The term "proximate cause" includes two basic components: one is the policy considerations to which we have alluded; the other is "causation

in fact." (See *Maupin, supra,* 192 Cal.App.3d at p. 573; *Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1049, fn. 3 [1 Cal.Rptr.2d 913, 819 P.2d 872].) "Causation in fact asks whether the defendant's negligent conduct was the 'necessary antecedent' to the injury, without which no injury would have occurred." (*Maupin, supra,* 192 Cal.App.3d at p. 573.) We are not concerned with causation in fact here. We think the Conference's hiring of Murphy as the pastor at Hughson Church can be deemed a "substantial factor" (and thus a cause-in-fact) in bringing about Eyrene's injury. (*Id.* at p. 574; see also *Mitchell, supra,* 54 Cal.3d at p. 1041; Rest.2d Torts, § 431.)

Our concern is with the policy considerations component of proximate cause. That component "asks the larger, more abstract question: *should* the defendant be held responsible for negligently causing the plaintiff's injury?" (*Maupin, supra,* 192 Cal.App.3d at p. 573, italics added; see *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814].) A respected work in the field of tort law, Prosser and Keeton on Torts, describes this aspect of proximate cause as follows: " 'Proximate cause'—in itself an unfortunate term—is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct. In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would 'set society on edge and fill the courts with endless litigation.' As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy. [¶] This limitation is to some extent associated with the nature and degree of the connection in fact between the defendant's acts and the events of which the plaintiff complains. Often to greater extent, however, the legal limitation on the scope of liability is associated with policy—with our more or less inadequately expressed ideas of what justice demands, or of what is administratively possible and convenient. . . . The attempt to deal with such cases in the language of causation leads often to confusion. . . . [¶] . . . [¶]Once it is established that the defendant's conduct has in fact been one of the causes of the plaintiff's injury, there remains the question whether the defendant should be legally responsible for the injury. Unlike the fact of causation, with which it is often hopelessly confused, this is primarily a problem of law. . . ." (Prosser & Keeton, *supra,* §§ 41-42, pp. 264, 272-273, fns. omitted; see *Mosley, supra,* 26 Cal.2d at pp. 220-223 (conc. opn. of Traynor, J.).)

■ The issue therefore is whether policy considerations preclude Eyrene from maintaining her action for negligent hiring against Conference. We conclude they do.

Nationwide, there is a split of authority on whether an employer can be liable to a third person for negligently hiring an employee. (53 Am.Jur.2d, Master and Servant, § 422, p. 435; *Underwriters Inc. Co.* v. *Purdie* (1983) 145 Cal.App.3d 57, 68-69 [193 Cal.Rptr. 248].) One line of cases does not recognize the concept of "negligent hiring" as an independent ground of actionable negligence. (*Ibid.*) These cases center liability on the negligent employee's conduct. (*Ibid.*)

The other view, which California follows, is that an employer may be liable to a third person for negligently hiring an incompetent or unfit employee. (*Underwriters Ins. Co.*, *supra*, 145 Cal.App.3d at p. 69; *Monty* v. *Orlandi* (1959) 169 Cal.App.2d 620, 625 [337 P.2d 861].) California follows the rule set forth in the Restatement Second of Agency section 213, which provides in pertinent part: "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless: . . . [¶] (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others[.]" (*Ibid.*)

Comment d to this Restatement section reads in pertinent part: "The principal may be negligent because he has reason to know that the servant or other agent, *because of his qualities, is likely to harm others* in view of the work . . . entrusted to him. . . . [¶] An agent, although otherwise competent, may be incompetent *because of his reckless or vicious disposition*, and if a principal, without exercising due care in selection, employs a vicious person to do an act which necessarily brings him in contact with others while in the performance of a duty, *he is subject to liability for harm caused by the vicious propensity.* . . . [¶] *If . . . the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee* which the employer had reason to suppose would be likely to cause harm." (Rest.2d Agency, *supra*, § 213, com. d, italics added.)

A related rule is found in the Restatement Second of Torts section 449: "If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." As Witkin notes in this regard, "in a large number of situations the very reason why the defendant's conduct is negligent is that it creates the risk of the particular intervening criminal act, and that it is absurd to invoke the very fact which establishes negligence to absolve the negligent person from liability." (6 Witkin, Summary of Cal. Law, *supra*, § 993, p. 383.)

Eyrene was not molested by Duane Murphy. Instead, she was molested by one of Murphy's victims—her brother, Evan. Eyrene's claim against Conference centers on the alleged negligent hiring of a child molester, Duane

Murphy. The theory of negligent hiring here, therefore, is tied to the *particular risk or hazard of Murphy molesting a child*. This is the conduct for which the employer, Conference, is liable. In other words, the risk that Murphy will act in a certain way (i.e., molest a child) is the cornerstone of Conference's liability. Had Murphy driven negligently, there would be no cause of action for negligent hiring on the facts before us.

Eyrene wants to sue Conference for negligently hiring Murphy because the victim of Murphy's molestation, Evan, in turn molested her. But Eyrene's position is a step removed from the negligently hired employee and a step removed from that employee's conduct. In the abstract, it is a speculative venture as to how or even whether a molestation victim will "act out." As we have seen, the theory of negligent hiring here encompasses the *particular risk of molestation by an employee* with a history of this specific conduct. It does not encompass acts done by nonemployees, such as Evan, or consequences involving less particular, even speculative, hazards.

To conclude otherwise would impose liability on the person who hired the person who molested the person who molested the person in Eyrene's position. This convoluted syntax alone argues against imposing liability in this situation. It also graphically illustrates the problem of imposing liability for negligent hiring in light of plaintiffs' theory of "molestation perpetuation." As noted previously, there is quite a legal debate nationwide about whether the concept of negligent hiring constitutes an independent tort at all. Those jurisdictions holding there is no independent action deem it sufficient that the direct tortfeasor (the employee) can be held liable. In a sense, this debate supports the conclusion we have reached here.

Eyrene argues that it would be divisive to sue her brother and that the line of liability should be drawn at the immediate family. But Eyrene acknowledges the line must be drawn somewhere, and we think it is less arbitrary to draw the line at the employee's direct acts than to draw it at the "immediate family," whatever that term would encompass. Can it rationally be said that if a molestation victim like Evan "acts out" against a stranger or even a "non-immediate" family member, that behavior matters less than an act against an "immediate" family member?

Aside from the question of *how* the molestation victim might "act out," there is the question of *when* the victim might act, if at all. How long is the span of liability? Since we are dealing with *child* molestation, conceivably the child could wait for many years until the age of majority to sue. Eyrene makes much of the fact that Evan molested her two weeks after he was molested by Murphy. At one point, Dr. Terr's testimony and statements

indicate this time span was an important factor in her conclusion that Evan's molestation of Eyrene was a sexual reenactment of his molestation. At another point, however, Dr. Terr stated this span was not a significant factor in this conclusion. Moreover, Dr. Terr could only say "that children who have been abused or molested often abuse or molest others *at a later date.*" (Italics added.) A short period of time, therefore, does not appear vital to the liability equation here.

Finally, it must be realized that Eyrene's action for negligent hiring against Conference is based on *two* intervening criminal acts of molestation. In the past, courts were reluctant to impose civil liability when a single criminal act had intervened. (See 6 Witkin, Summary of Cal. Law, *supra*, §§ 992-993, pp. 382-384.) This reluctance has given way in more recent times, particularly in the negligent hiring/criminal act arena where it is necessarily incompatible. (*Ibid.*) But where two or more criminal acts have intervened, this reluctance may still be justified.

In light of all of these policy considerations, we conclude that Eyrene cannot recover against Conference for negligently hiring Murphy.[1]

■ We now consider whether Eyrene can recover against Conference for negligently inflicting emotional distress upon her. Three theories of recovery are implicated. First, on appeal, Eyrene acknowledges that "[h]er cause of action for emotional distress is compensable to her as an element of damages arising out of the negligent hiring of Murphy." To the extent this is the case, the fall of Eyrene's negligent hiring action spells the fall of her emotional distress claim. (See 6 Witkin, Summary of Cal. Law, *supra*, § 838, pp. 194-195.)

Second, in her negligent infliction of emotional distress (NIED) cause of action, Eyrene alleges that she "personally observed the mental, physical and emotional injuries suffered by Evan [F.] at the time of the occurrences alleged herein and thereafter; . . ." This allegation appears to state a claim under the NIED theory advanced in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]. In *Dillon*, the court held that a mother could recover from a negligent motorist for the emotional distress she suffered upon witnessing the accident that killed her child. Recently, the

[1]Because we conclude, on policy grounds, that Eyrene's injury was not proximately caused by Conference, we have no occasion to consider whether Evan's criminal acts against Eyrene were a superseding cause of her injury. (See *Mosley, supra,* 26 Cal.2d at p. 219; *Richardson* v. *Ham* (1955) 44 Cal.2d 772, 777 [285 P.2d 269]; *Campodonico* v. *State Auto Parks, Inc.* (1970) 10 Cal.App.3d 803, 808 [89 Cal.Rptr. 270]; *Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 58-59 [192 Cal.Rptr. 857, 665 P.2d 947]; 6 Witkin, Summary of Cal. Law, *supra*, §§ 992-993, pp. 382-384.)

California Supreme Court, in *Thing* v. *La Chusa, supra,* 48 Cal.3d 644, enacted definite limitations on the right of recovery in an action founded on *Dillon.* ▆ Now, "a plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, but only if, said plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." (*Id.* at pp. 667-668, fns. omitted.) The second element identified in *Thing*—presence at the scene and awareness of injury—has been interpreted "as a requirement that *Dillon* plaintiffs experience a contemporaneous sensory awareness of the causal connection between the negligent conduct and the resulting injury." (*Golstein* v. *Superior Court* (1990) 223 Cal.App.3d 1415, 1427 [273 Cal.Rptr. 270].)

▆ The undisputed facts in this case show that Eyrene was not present at the scene when Murphy—let alone Conference—injured Evan and was not then aware that Murphy's or Conferences's actions caused injury to Evan, and therefore she did not experience a contemporaneous sensory awareness of the causal connection between the Conference's conduct and Evan's resulting injury. Eyrene cannot state a claim for NIED against Conference under the theory advanced in *Dillon.*

Finally, Eyrene alleged in her NIED action that "[i]t was reasonably foreseeable and easily predictable that defendants' actions, counseling and sexual molestation of EVAN [F.] would lead to serious emotional distress for EYRENE [F.] . . . ," that "these defendants are liable for the actions of defendant DUANE K. MURPHY as he counseled and ministered to each of [the] plaintiffs individually and as a family unit," and that "plaintiff EYRENE [F.] sustained physical harm and injury as a consequence of EVAN [F.'s] direct sexual molestation of her stemming from and proximately caused by the molestation to him by defendant DUANE K. MURPHY acting as an agent of HUGHSON UNITED METHODIST CHURCH. . . ." In this way, Eyrene attempts to analogize her position to that of the plaintiffs in *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583 [257 Cal.Rptr. 98, 770 P.2d 278]. The analogy is not well drawn. In *Marlene F.,* two mothers were allowed to bring an action for NIED against a psychotherapist. The therapist, who was treating *both* the mothers and their respective sons for family emotional problems encompassing the mother-son relationship, molested the sons during the course of treatment. The court, relying on *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518], emphasized that the mothers were the

patients of the therapist, along with their sons, and that the therapist's tortious conduct was accordingly directed against both. (*Marlene F.*, 48 Cal.3d at p. 591.) Eyrene attempts to show that she had a counseling relationship with Murphy. But Eyrene's relationship with Murphy—which consisted of her telling him on three or four occasions that her brothers did things she did not like, such as pulling her hair or calling her a brat—nowhere approaches the level or seriousness of the relationship at issue in *Marlene F.* More significantly, Murphy's conduct, unlike the therapist's conduct in *Marlene F.*, cannot be considered *directed* at Eyrene. A fortiori, Conference's conduct regarding Murphy's molestation of Evan cannot be considered directed at Eyrene.

In a recent case, our Supreme Court relied on *Marlene F.* and reiterated the significance of the relationship of the parties to one another in determining liability in the NIED context under Molien. In *Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064 [9 Cal.Rptr. 615, 831 P.2d 1197], the court noted that the *Molien* theory of recovery of NIED damages is grounded in a duty assumed by the defendant or imposed as a matter of law or that arises from a preexisting relationship between the plaintiff and the defendant that is negligently breached. (*Id.* at pp. 1073-1074.) Specifically, the court in Burgess held that a mother can recover NIED damages against a physician who enters into a physician-patient relationship with her for care during labor and delivery if her child is injured during the course of a negligent delivery. (*Id.* at p. 1069.) The Burgess court rejected the physician's contention that while his alleged negligence breached a duty of care owed to the injured child, it did not breach a duty of care owed to the mother since he avoided physically injuring her. Recognizing the unique physical and emotional realities of pregnancy and childbirth, the court noted that the mother established a physician-patient relationship with the doctor for medical care which was directed not only to avoiding injury to her fetus but also to the emotional distress she would suffer if such injury occurred. (*Id.* at pp. 1075-1076.) Again, however, Conference's conduct regarding Murphy's molestation of Evan does not implicate a relationship such that the conduct can be considered directed against Eyrene.

■■■ For these reasons, we conclude that Eyrene cannot maintain a NIED claim against Conference.[2]

---

[2]Eyrene also sued Conference for negligent misrepresentation. She alleged that Conference negligently failed to disclose to her Murphy's history as a pedophile and sex deviant, and that Conference, by its words and conduct, affirmatively represented that Murphy was a qualified minister without history of sexual deviance. The record shows that the only representations defendants made to plaintiffs regarding Murphy were *implied* representations that Murphy was fit to be a minister. The record does not show that Conference, or any of the defendants,

## 2. *Eyrene and Evan Against Hughson Church*

■   The policy concerns and doctrinal limitations which defeat Eyrene's causes of action for negligent hiring and negligent infliction of emotional distress against Conference apply with equal force to her identical actions against Hughson Church. Accordingly, Eyrene cannot recover from Hughson Church.

■   However, Evan's cause of action against Hughson Church for negligently hiring Murphy does not implicate these policy considerations. In reviewing this summary judgment ruling, a determination of an issue of law based on these considerations is not implicated as was the case with Eyrene. (See *Burke Concrete Accessories* v. *Superior Court, supra*, 8 Cal.App.3d at pp. 774-775.) Rather, Evan's cause of action for negligent hiring implicates the more traditional summary judgment review of whether a triable issue of material fact exists. The review principles in that context are as follows.

A motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the

---

ever affirmatively represented that Murphy was not a sex deviant. The tort of negligent misrepresentation requires a "positive assertion" and does not apply to implied misrepresentations. (*Yanase* v. *Automobile Club of So. Cal.* (1989) 212 Cal.App.3d 468, 473 [260 Cal.Rptr. 513]; *Huber, Hunt & Nichols, Inc.* v. *Moore* (1977) 67 Cal.App.3d 278, 304 [136 Cal.Rptr. 603]; Civ. Code, § 1572, subd. 2; see Civ. Code, § 1710, subd. 2.) Accordingly, the record shows, as a matter of law, that Eyrene does not have a cause of action against Conference for negligent misrepresentation, and therefore cannot seek any damages for negligently inflicted emotional distress on that basis.

The vicarious liability theory of respondeat superior is not invoked in this appeal either. The trial court had ruled that Conference and Dew were not vicariously liable for Murphy's acts. In light of our conclusion that Conference is not liable to Eyrene on a negligent hiring theory, it would be anomalous to hold Conference liable under a theory of respondeat superior. This is because Conference would have greater liability when it was merely vicariously liable than when it allegedly engaged in affirmative negligent acts ·by hiring Murphy.

Furthermore, we are not aware of any California decision that has held a religious institution liable under the theory of respondeat superior for the acts of institution personnel in molesting parishioners. (See *Jeffrey E.* v. *Central Baptist Church* (1988) 197 Cal.App.3d 718, 722-724 [243 Cal.Rptr. 128] [church not vicariously liable for sexual abuse of minor by Sunday school teacher]; *Rita M.* v. *Roman Catholic Archbishop* (1986) 187 Cal.App.3d 1453, 1461 [232 Cal.Rptr. 685] [archbishop not vicariously liable for sexual relations between seven priests and minor parishioner].) However, respondeat superior liability has been applied to governmental entities for sexual assaults committed by on-duty, uniformed police officers misusing their official authority. (See *White* v. *County of Orange* (1985) 166 Cal.App.3d 566 [212 Cal.Rptr. 493]; *Mary M.* v. *City of Los Angeles* (1991) 54 Cal.3d 202 [285 Cal.Rptr. 99, 814 P.2d 1341].) In any event, all of these cases encompass only the direct acts of the molester or perpetrator, not the acts of the molester's victims. This is entirely understandable since, under the doctrine of respondeat superior, "an employer is *liable for the torts of employees* committed within the scope of employment." (*Jeffrey E., supra*, 197 Cal.App.3d at p. 721, italics added.)

moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The purpose of summary judgment is to penetrate evasive language and adept pleading and ascertain the presence or absence of triable issues of fact. (*Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310].) On such a motion, the papers of the moving party must be strictly construed and those of the opposing party liberally construed. Doubts as to the propriety of granting the motion should be resolved in favor of the opposing party. (*Charpentier* v. *Von Geldern* (1987) 191 Cal.App.3d 101, 106 [236 Cal.Rptr. 233].) In ruling on the motion, the trial court is to determine whether such issues of fact exist and not to decide the merits of the issue. (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) The reviewing court conducts a de novo examination to determine whether there are any genuine issues of material fact or whether the moving party is entitled to summary judgment as a matter of law. (*Decker* v. *City of Imperial Beach* (1989) 209 Cal.App.3d 349, 353 [257 Cal.Rptr. 356].) To succeed, a defendant moving for summary judgment must conclusively negate a necessary element of the plaintiff's case, and demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial. (*Donald* v. *Sacramento Valley Bank* (1989) 209 Cal.App.3d 1183, 1190 [260 Cal.Rptr. 49].)

The trial court granted summary judgment for Hughson Church because the church "had no actual knowledge of the history of Murphy and did not fail to fulfill any duty owed to the plaintiffs."

As noted previously, California law on negligent hiring follows the rule and comment set forth in the Restatement Second of Agency section 213. (*Underwriters Ins. Co., supra,* 145 Cal.App.3d at p. 69; *Monty, supra,* 169 Cal.App.2d at pp. 624-625.) Comment d to section 213 provides in pertinent part: "The principal may be negligent because he has *reason to know* that the servant or other agent, because of his qualities, is likely to harm others in view of the work or instrumentalities entrusted to him. . . . [¶] An agent, although otherwise competent, may be incompetent because of his reckless or vicious disposition, and if a principal, *without exercising due care in selection*, employs a vicious person to do an act which necessarily brings him in contact with others while in the performance of a duty, he is subject to liability for harm caused by the vicious propensity. . . . [¶] If liability results it is because, under the circumstances, *the employer has not taken the care which a prudent man would take in selecting the person for the business at hand. . . . If . . . the work is likely to subject third persons to serious risk of great harm, there is a special duty of investigation.* [¶] Liability results under the rule stated in this Section, not because of the relation of the parties, but because the employer antecedently *had reason to believe* that an

undue risk of harm would exist because of the employment." (Italics added.) Accordingly, in California, an employer can be held liable for negligent hiring if he knows the employee is unfit, or has reason to believe the employee is unfit or fails to use reasonable care to discover the employee's unfitness before hiring him. (*Ibid.*; see 53 Am.Jur.2d. Master and Servant, § 422, pp. 436-437.)

The summary judgment evidence viewed most liberally to Evan shows the following. Hughson Church hired Murphy for the youth director position it created in 1977. This hiring took place without an investigation, but was based on the knowledge that Murphy was a Methodist minister working as a counselor at a secular high school and on the fact that several parishioners in the church knew and recommended Murphy. When the pastor position at Hughson Church became available in 1982, Murphy approached the relevant committee at the church, the pastor/parish relations committee (Committee). Murphy informed the Committee that he was no longer employed as a school counselor, that he was available to return to full-time ministry as the church's pastor and that he would enjoy the Committee's support in obtaining the position. Pursuant to the pastor appointment procedure, Committee informs the Conference of the vacancy, consults with the Conference regarding the appointment and then approves or disapproves the Conference's selection. Committee agreed to support Murphy—with Evan's father as the sole dissenter—"if he was reinstated, permitted to return to full-time ministry."

Committee became aware of some difficulty with Murphy's reappointment to the active ministry and understood he had been on a sabbatical of some kind. Committee also knew that Murphy had requested reappointment only if he could be assigned to Hughson Church. Nevertheless, Hughson Church did not investigate or make any inquiry regarding Murphy's fitness to serve as pastor. Three years into his pastorship, Murphy molested Evan.

Apparently, Hughson Church had no actual knowledge of Murphy's past. But the evidence recounted above presents triable issues of material fact regarding whether the Church had reason to believe Murphy was unfit or whether the Church failed to use reasonable care in investigating Murphy. Accordingly, the trial court erred in granting summary judgment for Hughson Church on Evan's cause of action for negligent hiring.[3]

---

[3]As part of Evan's cause of action for negligent hiring, Evan can obtain damages for emotional distress if he can prove them.

Summary judgment was properly granted regarding Evan's cause of action for negligent misrepresentation against Hughson Church. That cause of action involves the same

## DISPOSITION

The judgment is reversed regarding Evan's cause of action for negligent hiring against Hughson Church. In all other respects, the judgments are affirmed. Each party is to pay its own costs on appeal.

Sparks, Acting P. J., and Nicholson, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 29, 1992.

---

allegations and evidence as Eyrene's action for negligent misrepresentation against Conference and Hughson Church. Consequently, it suffers from the same defect—no evidence, as a matter of law, of a positive assertion. (See fn. 2 *ante*; *Yanase* v. *Automobile Club of So. Cal.*, *supra*, 212 Cal.App.3d at p. 473; *Huber, Hunt & Nichols, Inc.* v. *Moore*, *supra*, 67 Cal.App.3d at p. 304; Civ. Code, §§ 1572, subd. 2, 1710, subd. 2.)