Filed 9/8/15 Ozor v. Fluor Intercontinental CA1/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SELMA OZER, Plaintiff and Appellant, v. FLUOR INTERCONTINENTAL INC. et al., Defendants and Respondents. | A140348 (City & County of San Francisco Super. Ct. No. CGC-08-477966) |

In 2006 an Mi-8 helicopter crashed in Afghanistan, killing all 12 onboard, including Ihsam Ozer. The helicopter was being operated by employees of Tryco International, Inc. (Tryco), which was operating the helicopter pursuant to a contract with Fluor Intercontinental, Inc. (Fluor).

In 2008 Selma Ozer (Ozer), alleging to be the widow of Ihsam, filed a complaint in the City and County of San Francisco, naming as defendants Fluor and Tryco, essentially alleging negligence against Tryco and negligent hiring and retention against Fluor. The lawsuit finally went to trial in 2013, against Fluor only, Tryco at that point having been dismissed for lack of jurisdiction. It was a court trial presided over by the Honorable Anne-Christine Massullo who, following 11 days of trial, filed a detailed 20-page statement of decision, finding against Ozer, concluding among other things that Ozer failed to meet her burden of proof.

Virtually ignoring that statement of decision, Ozer's appeal asserts four arguments, that: (1) Judge Massullo erroneously excluded the reports of the crash; (2) a

1

negligent hiring case does not require a showing that the hired party was negligent; (3) res ipsa loquitur applied as a matter of law; and (4) the evidence relied on by Judge Massullo was not substantial evidence. We conclude that none of Ozer's arguments has merit, and we affirm.

## BACKGROUND

### The General Factual Setting

On July 28, 2008, Ozer filed a complaint, followed by an amended complaint, the operative pleading here (Complaint). Ozer alleged she was the surviving wife of Ihsam Ozer (and the personal representative of his estate), who was killed on July 26, 2006, when a helicopter crashed into a mountain in Afghanistan. The complaint named as defendants five Tryco-related entities and three Fluor-related entities,[1] and alleged that the helicopter was being operated by representatives of Tryco, under a contract it had with Fluor, which itself had contracted with the United States Army Corps of Engineers to build a base for the Afghanistan Army.

The complaint was styled "wrongful death and survival," and purported to allege six causes of action: (1) negligence, against both defendants; (2) negligence per se, against Tryco; (3) through (5) negligent hiring, against Fluor, based on three different theories; and (6) negligent retention, against Fluor. The complaint sought general, special, and punitive damages.

Ozer's lawsuit apparently generated significant activity, manifest by a 43-page register of actions. The record before us reveals little of that activity, which in any event is not germane to the issues here. Thus, we will not discuss it, save to set out a few things that did—and, as importantly, did not—occur in the 57 months the lawsuit was pending before trial.

---

[1] The defendants named were "Franz Zenz d/b/a Tryco, Tryco International, Tryco Inc., and Tryco International Inc.; Tryco Inc; Fluor Intercontinental, Inc.; Fluor Corporation; Fluor International, Inc."

2

As to what did occur, Tryco successfully moved to have the action dismissed for lack of jurisdiction, from which Ozer appealed, which appeal was pending at the time the case went to trial.

As to what did not occur, three things are significant. First, Ozer propounded no discovery directed at Tryco. Second, Ozer was never deposed, this despite an August 16, 2010 order granting Fluor's motion to compel her deposition, and despite her counsel's apparent agreement to produce Ozer for deposition prior to trial. And third, Ozer did not appear at the beginning of trial, a fact that generated much discussion, and several promises by Ozer's counsel to assure Ozer's presence, who nevertheless did not arrive until the seventh day of trial. The effect of this was that a very patient Judge Massullo finally determined that Ozer's right to a jury trial had been waived, ultimately to rule that Ozer would be precluded from testifying.

Against that background, and Fluor's waiver of its right to jury trial, the case proceeded to a court trial before Judge Massullo, who presided over 11 days of trial, including lengthy Evidence Code section 402 hearings involving Ozer's designated expert witnesses. Much of the evidence at trial is likewise not germane to the issues here, and is not discussed, other than to describe the circumstances that led to the relationship between Fluor and Tryco, and the crash, which is this:

Following September 11, 2001, the United States set out on a "Global War on Terror." In connection with that, Fluor entered into a contract with the United States Army Corps of Engineers, pursuant to which Fluor agreed to provide design-build and/or construction-related services in the United States Central Command Area of Responsibility, to support the interest of the United States.

One such project involved the construction of a regional brigade complex for the Afghanistan National Army, to be located near the City of Khost. The brigade complex was described as "like a little city," with "a hospital, a dining facility that would feed some 5,000 people, housing for these people, and paved roads." The construction of the complex necessitated the transport of personnel and materiel within Afghanistan, between Kabul and Khost. Members of Al-Qaeda and Taliban lived in villages near

3

Khost, and because of this, and because roads would ice up in the winter, movement by road was regarded as an "extremely high risk" activity. This included risk of being killed or taken hostage by Al Qaeda or Taliban fighters.

The primary subcontractor for Fluor on the brigade complex project was Yuksel which, understandably concerned about traveling by convoy, sought assistance with its essential transportation needs from the pool of air transport companies that provided air service in the region. Some of these were already committed to exclusive contracts with large organizations; others had limited availability, dedicated primarily to the United States government or United Nations agencies. Yuksel chose Tryco, was satisfied with its performance, and introduced it to Fluor. By contract effective August 24, 2005, Fluor contracted with Tryco to provide chartered flights to the construction site.

The Fluor-Tryco relationship apparently proceeded without incident for 11-months, until July 26, 2006, when a helicopter crashed some 20-miles north-northwest of Khost, a location in the "mountains where security is a problem." All 12 on board were killed.

As to what caused the crash, Ozer tried to prove her case without any aviation expert. One such expert did testify, one called by Fluor, one whom Judge Massullo specifically commented as being very good, very credible: Douglas Stimpson. Stimpson, who had over 45 years of experience and had investigated over 2,800 aviation accidents, testified that "an accident investigator, using the proper methodology and techniques, would be unable to render an opinion as to the cause of this accident." According to Stimpson, to conduct a proper investigation, a competent aviation accident investigator would need information about the "man, the machine, and the environment"—information was lacking here.

As to the men, the pilots, there was no "pilot information, [no] biography." There was no evidence "how old the pilot[s were:] Whether they have medical situations." There was no autopsy or toxicology information.

As to the machine, the helicopter, Stimpson explained that "[w]e have no wreckage . . . . We have very little information about . . . the aircraft itself. . . . [W]e

4

don't have maintenance records we can review. We don't have inspection records." "[W]e want to know [but don't] if it just came out of maintenance." No evidence was captured by the "black boxes," neither the cockpit voice recorder nor the flight data recorder. Indeed, none of the wreckage was ever collected for examination, analysis, and testing.

As to the environment, Stimpson said "[w]e have no eye witnesses. We have no radar data. We have no weather data." The accident site was never properly secured. In fact, no trained accident investigator ever went there.

Stimpson summed it up this way: "[t]here's . . . much more missing . . . than there is available." With so much information unavailable, many potential causes of the accident could not be ruled out, including mechanical failure, component part failure, pilot incapacitation, a bird strike, foreign object damage, or ground fire or other hostile action. In his words, ruling out any of these, or other, possible causes would "absolutely" require speculation.

### The Proceedings Below

We begin with a few observations about the trial, including that presentation of Ozer's case was hardly a model of trial preparation, this despite that the trial was almost five years after the complaint was filed. There were many scheduling incidents, many disruptions, and many apologies from Ozer's counsel. As to this, Judge Massullo "bent over backwards" to accommodate Ozer's counsel, to the point that Judge Massullo was concerned about it. Thus, for example, on April 16, the eighth day of trial, Judge Massullo said:

"I will tell you, Ms. Barlow. The court has bent over backwards, candidly, to accommodate literally every problem that has been presented, and—in this trial. To try to make it a fair trial for both sides. But right now, the lack of preparation—it is hard for the court to ignore. Because now, I feel as though the court is tipping the scales in favor of the plaintiff. [¶] The court is supposed to be neutral. And yet, there are so many problems, the court is trying to be fair, trying to allow you to present a case. But the court did not create the problems that come in the doors, literally, every hour. And—and

5

now, the court has to say: well, what do we do?  There's an expert who is here, who is literally not prepared, based on the court's rulings yesterday.  So do we continue him?  Do we—do we go forward, subject to a motion to strike?  I—really there are—there are very few—the options are getting more limited, the more the court has to make accommodations."[2]

The last day of testimony was April 18, at the conclusion of which Judge Massullo ordered the parties to file briefs on the issues of res ipsa loquitur and negligent hiring, to be followed by closing argument.

That argument occurred on May 3,[3] at the conclusion of which Judge Massullo requested both sides to submit proposed statements of decision.  They did.

On September 20, Judge Massullo filed a comprehensive, detailed 20-page statement of decision.  The decision found against Ozer on all particulars, with several conclusions devastating to her, all conclusions supported by extensive reference to the supporting evidence or, in the case of res ipsa loquitur, extensive analysis of the law.  These conclusions included the following:

"Ozer failed to meet her burden of proving, by a preponderance of the evidence, that with respect to The Accident, independent contractor, Tryco, was negligent.  Neither Mr. Gordon Nezich nor Mr. William John Funnell established that Tryco deviated from the standard of care for the safe operation of The Helicopter at the time of The Accident.  Nor did Ozer proffer any other evidence, testimonial or documentary, that would support such a conclusion."

"The court also finds that *res ipsa loquitur* does not apply in this case [¶] . . . [¶]

"Even if she could prove negligence and causation on the part of Tryco, Ozer failed to present evidence to sustain her burden on negligent hiring by Fluor.

---

[2] Two days later, Judge Massullo made a similar comment:  "Kn[o]w what, there have been many apologi[es from plaintiff's counsel] and the court has extended, it believes, many courtesies.  To a point where the court's concerned that the perception may be that the court is tipping the scale, which the court is not supposed to do."

[3] That day, Ozer also made a motion for reconsideration, which was denied.

6

"Because Ozer presented no expert testimony in this case regarding the standard of care applicable to Fluor's hiring of Tryco, and such testimony would be required in this case, Ozer failed to establish a prima facie case of negligent hiring even if she had proven negligence and causation on the part of Tryco. [Fn. omitted.]"

Judgment was thereafter entered, from which Ozer timely appealed.

## DISCUSSION

As noted, Ozer makes four arguments on appeal, the last with two subparts. We will discuss them in turn. Before doing so, however, we begin with a few observations about Ozer's brief, observations we make in light of settled principles of appellate review, many of which we collected and confirmed in *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507. The appellant there, like Ozer here, filed a brief that set forth the facts favorable to her, as though the trial court's comprehensive fact-based statement of decision did not exist. Such conduct, we said, was "not to be condoned," and went on to describe why:

"California Rules of Court, rule 8.204(a)(2)(C) provides that an appellant's opening brief shall '[p]rovide a summary of the significant facts. . . .' And the leading California appellate practice guide instructs about this: 'Before addressing the legal issues, your brief should accurately and fairly state the critical facts (including the evidence), free of bias; and likewise as to the applicable law. [¶] Misstatements, misrepresentations and/or material omissions of the relevant facts or law can instantly "undo" an otherwise effective brief, waiving issues and arguments; it will certainly cast doubt on your credibility, may draw sanctions [citation], and may well cause you to lose the case!' (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2010) ¶ 9:27, p. 9–8 (rev. #1, 2010), italics omitted.) [Ozer's] brief does ignores [*sic*] such instruction.

"[Ozer's] brief also ignores the precept that all evidence must be viewed most favorably to [Fluor] and in support of the order. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925–926; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) This precept is equally applicable here, where [Judge Massullo] issued a statement of

7

decision:  'Where statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.'  (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358.)

"What [Ozer] attempts here is merely to reargue the 'facts' as she would have them, an argumentative presentation that not only violates the rules noted above, but also disregards the admonition that she is not to 'merely reassert [her] position at . . . trial.' (*Conderback, Inc. v. Standard Oil Co.* (1966) 239 Cal.App.2d 664, 687; accord, *Albaugh v. Mt. Shasta Power Corp.* (1937) 9 Cal.2d 751, 773.)  In sum, [Ozer's] brief manifests a treatment of the record that disregards the most fundamental rules of appellate review.  (See 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, §§ 365, 368, pp. 421-424, 425–426.)  As Justice Mosk well put it, such 'factual presentation is but an attempt to reargue on appeal those factual issues decided adversely to it at the trial level, contrary to established precepts of appellate review.  As such, it is doomed to fail.' (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398–399.)"  (*In re Marriage of Davenport, supra,* 194 Cal.App.4th at p. 1531.)

### The Exclusion of Evidence Was Not Error

Ozer's first argument is that Judge Massullo "improperly excluded" documents and testimony relating to weather conditions.  The argument specifically focuses on two items:  (1) a sentence that was deleted from a Federal Aviation Administration (FAA) report; and (2) the "Dutch report."

We review Judge Massullo's ruling on the admissibility of evidence for abuse of discretion.  (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1078.)  The erroneous exclusion of evidence does not require reversal unless the exclusion caused "a miscarriage of justice."  (Evid. Code, § 354.)  And a "miscarriage of justice" occurs only when the court, "after an examination of the entire cause . . . is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*People v. Watson* (1956) 46 Cal.2d 818, 836; accord, *People v. Richardson* (2008) 43 Cal.4th 959, 1001.)

8

Ozer has not demonstrated any such miscarriage of justice here. Indeed, she has not established error—Judge Massullo's rulings were right.

To put the issue in context, the essence of Ozer's theory as to the cause of the crash was weather-related pilot error. In an attempt to prove this, Ozer sought to rely on an FAA report prepared by James Richmond, who had prepared what he called a "briefing paper" and what Ozer calls a report. Fluor moved in limine to exclude the report, and Judge Massullo ruled she would deny the motion, "subject to objections."

Later, Ozer designated Richmond's deposition as part of her case, but not the exhibits to the deposition. And when Judge Massullo ruled on the admissibility of Richmond's testimony, Ozer did not advocate admission of the report, but did seek admission of his deposition testimony, included within which was this sentence he read that quoted from the FAA report: "However, the weather was marginal with low clouds and rain." After hearing argument, Judge Massullo ruled that Richmond's testimony would be limited to those matters based on his "firsthand observations," and as Richmond conceded he had no firsthand information about the weather at the crash site, the sentence would be excluded.

On the last day of trial, Ozer sought to augment her deposition designations to have the actual report admitted. Fluor stipulated the report could be admitted, with the exception of the one objectionable sentence. Ozer implored Judge Massullo to revisit the issue yet again. Reluctantly, and again expressing concern about tipping the scales in Ozer's favor, Judge Massullo agreed to "revisit the issue based on mistake, inadvertence or excusable neglect . . . that [plaintiff's counsel] didn't realize [she] had to designate the exhibits when [she was] designating the deposition." After hearing more argument, Judge Massullo reconsidered Ozer's request to admit Richmond's report in its entirety, ruling that she would admit the document with the exception of the one sentence. In Judge Massullo's words: "regarding the weather," the document does not satisfy Evidence Code section 1280, subdivision (c) because it lacks indicia of trustworthiness, commenting that "the sources of the weather in this report are hearsay, double hearsay, triple hearsay." That comment was correct.

9

Richmond had no direct knowledge of the weather. And what little information he claimed to know about "weather" came to him by a circuitous trail, from unknown—and unidentified—sources: he got an oral report from an unnamed individual at the International Security Assistance Force (ISAF) office in Afghanistan, who, in turn, was believed to have received the information from an anonymous pilot. The sentence was properly excluded.

Turning to the "Dutch report," it was identified as "Air Accident Investigation Report," further describing on its cover that it was a "preliminary report of the investigation of the accident with the Tryco Mi-8 MTV-1 helicopter, registration YA TAD, on the 26th of July 2006 in East Afghanistan." The only attempt to authenticate it was through Richmond, according to whom the "Ministry of Transport . . . and Civil Aviation in Afghanistan allowed the Dutch government to conduct the investigation," as "the Ministry of Transport clearly did not have that capacity."

Richmond further testified that he met with the Dutch team at the ISAF facility the day they arrived," which, he said, "[s]eems like it was about between one and two weeks" after the accident. Richmond said he met with "I think it was three" people, whose names he could not remember, for "one to two hours." Richmond could not recall the specifics of what he told the Dutch team or whether he provided them with any written materials. That was it, the sum total of Ozer's attempt at showing how the Dutch Report came to be. Judge Massullo ruled that the report would not be admitted, because Ozer had not authenticated it and it was replete with hearsay.[4] That ruling too was correct.

_____

[4] Dramatically showing the numerous shortfalls in the Dutch Report, Fluor's brief puts it this way: "Beyond this most elemental information, however, there is nothing in the record that helps explain the report. There is nothing to inform any of these (among other) issues:

> "Who were the 'Dutch investigators'?
>
> "What qualified them to conduct an aviation accident investigation?
>
> "When, where and how did they conduct the investigation?
>
> "With whom did they consult?

Beyond all that, Ozer could not demonstrate any miscarriage of justice, not in light of the comments on the last day of trial when, just before closing argument, counsel for Ozer asked Judge Massullo to reconsider some rulings. In the course of this, Judge Massullo made this observation in a comment to Ozer's counsel: "[Y]ou couldn't say it was pilot error. You just—you couldn't make that conclusion. Sadly, because this investigation was not really done that well. I mean, at the end of the day, *even if the Dutch report came in,* no one looked into the—with the level of detail Mr. Stimpson discussed during his testimony—the various causes for the crash. In other words, there's a checklist. It is almost like treating a patient. [¶] You have mechanical error, pilot error, you know—in a war zone—rocket fire, bullets. But you look—you look at—and you exclude various things." (Italics added.)

### A Negligent Hiring Claim Requires a Showing that the Hired Contractor is a Cause of the Injury

Ozer's second argument asserts that: "Negligent hiring of non-party helicopter operator Tryco does not require appellant to prove non-party Tryco's negligence as an element of the hirer's negligence." The argument fails, for two reasons.

The first reason is that it presupposes that Judge Massullo found that Fluor negligently hired Tryco. To the contrary, she concluded that "Ozer failed to present evidence to sustain her burden on negligent hiring by Fluor," a conclusion that is fully

---

"Who did they interview and under what circumstances? [¶] . . . [¶]

"What information and documentation did they receive and from whom?

"How was the report drafted and who drafted it?

"Was the report reviewed and edited and, if so, by who?

"Was there only one report?

"Why are some of the pages written in Dutch and others in English?

"Why do some of the exhibits differ from what is reflected in the table of exhibits?

"Why is the report labeled as 'preliminary'? And is there a final report?

"These are but a small fraction of the important questions to which there are no answers in the record."

11

supported, as the discussion below in connection with Ozer's fourth argument demonstrates.

The second reason is that the argument is legally wrong, as shown, for example, by *Diaz v. Carcamo* (2011) 51 Cal.4th 1148. *Diaz* involved a claim of negligent hiring of a truck driver who was involved in an accident. The Court of Appeal had distinguished an earlier Supreme Court case on the ground that case involved negligent entrustment, while *Diaz* involved negligent hiring. This distinction, the Supreme Court said, "fails. A claim that an employer was negligent in hiring or retaining an employee-driver rarely differs in substance from a claim that an employer was negligent in entrusting a vehicle to the employee. Awareness, constructive or actual, that a person is unfit or incompetent to drive underlies a claim that an employer was negligent in hiring or retaining that person as a driver." (*Id.* at p. 1157.) And, the court went on, negligence of the hired person is an essential part of a negligent hiring claim: "No matter how negligent an employer was in entrusting a vehicle to an employee, however, it is only if the employee then drove negligently that the employer can be liable for negligent entrustment, hiring, or retention [Citation] If the employee did not drive negligently, and thus is zero percent at fault, then the employer's share of fault is zero percent. That is true even if the employer entrusted its vehicle to an employee whom it knew, or should have known, to be a habitually careless driver with a history of accidents." (*Diaz* at pp. 1159–1160. [Fn. omitted.])

*Evan F. v. Hughson United Methodist Church* (1992) 8 Cal.App.4th 828 discussed the concept in the case of a molestation claim against a church. Holding that the church was not liable, the court noted as follows: "[A]n employer may be liable to a third person for negligently hiring an incompetent or unfit employee. [Citations.] California follows the rule set forth in the Restatement Second of Agency section 213," explained in Comment d: " 'The principal may be negligent because he has reason to know that the servant or other agent, *because of his qualities, is likely to harm others* in view of the work . . . entrusted to him. . . . [¶] An agent, although otherwise competent, may be incompetent *because of his reckless or vicious disposition,* and if a principal, without

12

exercising due care in selection, employs a vicious person to do an act which necessarily brings him in contact with others while in the performance of a duty, *he is subject to liability for harm caused by the vicious propensity."* (*Id.* at p. 836.)

Ozer relies primarily on *Phillips v. TLC Plumbing, Inc.* (2009) 172 Cal.App.4th 1133. It hardly helps her, beginning its discussion of the tort of negligent hiring by confirming that the elements of such cause of action include "(3) proximate [or legal] cause between the breach and (4) the plaintiff's injury." (*Id.* at p. 1138.)[5]—elements that necessarily implicate causation. The Court of Appeal went on to affirm the summary judgment for the defendant because the employer-employee relationship had ended on the termination of employment.

**Judge Massullo's Conclusion that Res Ipsa Loquitur Did Not Apply is Supported by the Record**

Ozer's third argument is that she established Tryco's liability "under the doctrine of *res ipsa loquitur*-as a matter of law." Ozer is wrong.

Over 40 years ago Justice Sullivan set out the applicable law, in *Newing v. Cheatham* (1975) 15 Cal.3d 351, 359, law that remains apt today:

"It is settled law in this state that the 'doctrine of res ipsa loquitur is applicable where the accident is of such a nature that it can be said, in the light of past experience,

---

[5] CACI No. 426 entitled "Negligent Hiring, Supervision, or Retention of Employee," sets forth the law, that "[to] establish this claim, [Plaintiff] must prove. . .:

"1. That [name of employee] was [unfit /[or] incompetent] to perform the work for which [he/she] was hired;

"2. That [name of employer defendant] knew or should have known that [name of employee] was [unfit /[or] incompetent] and that this [unfitness/ [or] incompetence] created a particular risk to others;

"3. That [name of employee]'s [unfitness/ [or] incompetence] harmed [name of plaintiff]; and

"4. That [name of employer defendant]'s negligence in [hiring/supervising/ [or] retaining] [name of employee] was a substantial factor in causing [name of plaintiff]'s harm."

Clearly, items 3 and 4 require that the hired employee or contractor do something wrong, that it be a "substantial factor" in causing the harm.

that it probably was the result of negligence by someone and that the defendant is probably the one responsible.  [Citations.]'  According to the classic and oft-repeated statement, there are three conditions for the application of the doctrine:  ' "(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff." ' [Citations.]  The existence of one or more of these conditions is usually a question of fact for the jury.  [Citations.]. . .   The question to be answered here is whether, as the trial judge determined, this is such a case."  (*Newing v. Cheatham, supra,* 15 Cal.3d at p. 359.)

*Newing* went on to hold that res ipsa loquitur applied there, in light of the known facts, which included that the airplane took off in clear weather; that there was no evidence weather conditions contributed to the crash; and that air collision was eliminated.  In short, that the airplane "fell to the ground, apparently unaffected by external factors."  (*Newing v. Cheatham, supra,* 15 Cal.3d at pp. 361–362.)

Ozer relies heavily on *Newing,* citing it no fewer than 11 times.  Such reliance is misplaced, as *Newing* is easily distinguishable, the facts here significantly different.  As indicated, res ipsa loquitur was the subject of much briefing below, both prior to trial and at its conclusion.  As also indicated, Judge Massullo concluded that the doctrine did not apply, a conclusion based on pages of analysis why neither the first nor the second required element was present.  That conclusion was correct.

The first requirement for res ipsa is that the event must be one which ordinarily does not occur in the absence of negligence.  "All of the cases hold, in effect, that it must appear, either as a matter of common experience or from evidence in the case, *that the accident* is of a type which probably would not happen unless someone was negligent."  (*Zentz v. Coca Cola Bottling Co. of Fresno* (1952) 39 Cal.2d 436, 442–443, (italics added).)  Ozer asserts that this first element can be satisfied by considerations of common sense, testimony of an expert witness, or the circumstances surrounding the particular accident.  Having said that, Ozer nowhere attempts to apply

14

any of these sources—all of which, not incidentally, militate against application of the doctrine.

As Judge Massullo noted, "Helicopter accidents can and do occur even in the absence of someone's negligence, particularly when flying over a war zone." And while res ipsa loquitur does not require that it "be concluded that negligence is the only explanation of the accident, but merely the *most probable one*." (See *Di Mare v. Cresci* (1962) 58 Cal.2d 292, 298–299.) And so Judge Massullo concluded: "[t]hese potential non-negligent causes of The Accident include, *inter alia*, hostilities (gun fire or rocket fire), a mechanical failure or a bird strike. Based on the testimony proffered at trial and the surrounding circumstances, e.g., the fact that The Accident occurred in an area rife with hostilities, the court finds the non-negligent explanations of The Accident to be as probable, if not more so, than Ozer's theory. See *Zentz v. Coca Cola,* 39 Ca1.2d 436 at 446-447 [identifying the central inquiry of the first element as 'whether the accident was of such a nature that the injury was more probably than not the result of the defendant's negligence.'].

It is entirely consistent with common sense to conclude that a helicopter flying in Afghanistan, in the summer of 2006, with hostilities regularly taking place, was vulnerable to a crash irrespective of pilot, or any other, negligence. Were there any doubt on this, two of Ozer's own pilot expert witnesses—Gordon Nezich and William Funnell—agreed that a helicopter could hit a mountain without someone being negligent.

**Ozer's No Substantial Evidence Arguments Have No Merit**

Ozer's last argument is one of substantial evidence, set forth in two subarguments as follows: "Evidence relied on by the trial court in finding the helicopter operator was not negligent in flying into the mountain is not 'substantial evidence' "; and "The evidence relied on by the trial court in finding the respondent hirere [*sic*] of the non-party helicopter operator was not negligent hiring fails to meet the 'substantial evidence' standard."

15

As noted, Judge Massullo found that Ozer failed to meet her burdens as to the cause of the accident and on her claim of negligent hiring. In light of this, the burden that confronts Ozer here is even more stringent than the substantial evidence test. It is this: "[w]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.,* 196 Cal.App.4th 466; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 967.)

Though Ozer's brief recognizes this rule, she does not even try to meet it. Nor could she, as there is much evidence favoring Fluor.

As to the cause of the crash, some of the pertinent evidence is set forth in connection with the discussion of res ipsa loquitur. Other evidence includes that from Mr. Stimpson, discussed above.

As to Ozer's second subargument, it proceeds from a false premise—that Judge Massullo found that Fluor's hiring of Tryco was "not negligent hiring." Judge Massullo made no such finding, as Fluor had no obligation to prove that there was "no negligent hiring." Ozer had to prove there was. And she failed.

To begin with, despite repeated admonitions from Judge Massullo, Ozer did not offer any evidence of the applicable standard of care. Thus, for example, at the conclusion of the case, Judge Massullo asked Ozer's counsel, "[w]hat witness did you present who—who can establish in Afghanistan, in 2006, when you are dealing with air transport under the government contract, this is the standard of care that you would use? Because the court is not at liberty to pick its own standard. And that's of grave concern, that this record doesn't appear to have all that information that a fact finder would need to hold Fluor liable for negligent hiring."

16

Ozer asserts she "had an expert witness who provided testimony on the applicable standard of care," and points to Gordon Nezich as that witness. But Nezich did not—indeed, could not—attest to the standard of care for hiring a helicopter operator for flights in Afghanistan in 2006, as he lacked the qualifications to do so. While an experienced helicopter pilot, Nezich had flown in Afghanistan only for a short period of time between the end of 2003 and the beginning of 2004. He had never flown an Mi-8 helicopter. And he knew nothing about how pilots were licensed in Afghanistan, most clearly shown by his response to Judge Massullo's question that "you said, you know nothing about Afghanistan, the requirements." Nezich's response: "That's right."

In short, Ozer presented no evidence as to the standard of care for the hiring of a helicopter operator in Afghanistan in 2006, much less evidence so compelling that it supports a judgment for Ozer as a matter of law.

Beyond that, there is no evidence that Tryco pilots were not qualified—and abundant evidence they were. While there was little evidence about the pilots, not even their names, what evidence there is hardly supports Ozer. The evidence included that the pilots had flown helicopters in the Afghanistan Air Force, and had amassed a significant number of flight hours doing so. Indeed, Joseph (Danny) Rider, of Fluor, a former United States Marine helicopter pilot who was called by Ozer as a friendly witness, gave testimony that was hardly friendly: Rider had met the pilots of the accident flight and they "absolutely knew their business" of flying helicopters in Afghanistan.

## DISPOSITION

The judgment is affirmed.

17

_____
Richman, J.

We concur:


_____
Kline, P.J.


_____
Stewart, J.