[No. B195418. Second Dist., Div. Two. July 3, 2008.]

NANCY DEUTSCH et al., Plaintiffs and Respondents, v.
MASONIC HOMES OF CALIFORNIA, INC., Defendant and Appellant.

749

**COUNSEL**

Sedgwick, Detert, Moran & Arnold, Nicholas W. Heldt, Cynthia H. Plevin and Ryan L. Harrison for Defendant and Appellant.

Niddrie, Fish & Buchanan, Martin N. Buchanan; Girardi & Keese, David N. Bigelow and Graham B. LippSmith for Plaintiffs and Respondents.

**OPINION**

**CHAVEZ, J.**—Masonic Homes of California, Inc. (appellant), appeals from the judgments entered following a jury trial. The jury awarded respondent Nancy Deutsch (Deutsch) $1,915,600 and respondent Sharon Mohr-McDermott (Mohr-McDermott) $1,615,600 (Deutsch and Mohr-McDermott will be collectively referred to as "respondents").

Deutsch, who was 46 years old at the time of trial, alleged that she was sexually abused by Earl Pearson, the husband of an employee of appellant, in 1968. Mohr-McDermott, who was 47 years old at the time of trial, alleged that she was sexually molested by the same individual in 1968. In addition, Deutsch claimed that she was molested in 1976 by Randy Azelton, who was, at the time, a 22-year-old employee of appellant.

In order to bring this action, which involved acts occurring over 30 years ago, respondents availed themselves of legislation passed in 2003 which revived certain claims of childhood sexual abuse. The legislation, Code of Civil Procedure section 340.1, subdivision (c) (section 340.1(c)), permitted plaintiffs whose claims of sexual abuse had expired to revive those claims against individuals or entities owing a duty of care to those plaintiffs and whose acts constituted a legal cause of the sexual abuse. Section 340.1(c) allowed such childhood sexual abuse claims to be commenced within one year of January 1, 2003. In November 2003, respondents sued appellant and one other defendant, who was eventually dismissed, for the acts of Earl Pearson and Azelton in 1968 and 1976. Neither Earl Pearson nor Azelton was named as a defendant.

We find that the trial court erroneously instructed the jury on the degree of knowledge or notice necessary to revive a lapsed claim under section 340.1(c), and that such error was prejudicial. Therefore, we reverse and remand the matter for a new trial. Because our decision necessitates a new trial, we shall address all of appellant's properly preserved claims of error which are not rendered moot by the reversal.

## CONTENTIONS

Appellant contends that (1) section 340.1(c) is unconstitutional on its face; (2) section 340.1(c) is unconstitutional as applied in this case; (3) due process required exclusion of specific evidence that appellant was prevented from rebutting due to the death and incompetence of key witnesses; (4) the trial court erroneously excluded scientific evidence regarding the change in common awareness of sexual abuse of children; (5) the trial court erroneously refused to instruct the jury on weighing evidence where potentially controverting evidence has been lost due to the passage of time; (6) the trial court erroneously instructed the jury on the elements to revive a lapsed claim, specifically the statute's required "notice" provision and the statute's requirement that the offender be an "employee, volunteer, representative, or agent" of appellant; (7) the trial court erroneously instructed the jury on the elements of the substantive tort of negligent supervision, specifically the notice requirement; (8) the trial court erroneously instructed the jury on the doctrine of respondeat superior liability; (9) the trial court erroneously entered judgment

on inconsistent verdicts; (10) the damages verdicts are fatally flawed because there was no admissible evidence to support respondents' damages awards; (11) the damages verdicts are fatally flawed because the jury was improperly instructed on causation; and (12) the causation verdict rests upon known false evidence.

## FACTUAL BACKGROUND

### 1. *The Masonic Home for Children in Covina (MHCC)*

In the 1960's and 1970's, MHCC was a residential home for orphans and children from broken families. It was owned and operated by appellant.

Deutsch was born in 1960. She entered MHCC in June of 1966, at the age of six. With the exception of a six-month period of time between June 1969 and January 1970, she remained at MHCC until she graduated from high school.

Mohr-McDermott was born in 1959. She was admitted to MHCC in February 1967 at age seven, and left 10 years later.

When Deutsch and Mohr-McDermott first entered MHCC, the residence for children consisted of large buildings divided into dormitory-like floors, which were subdivided into separate cubicles for each child. The children were divided into small groups by age and gender. Each group of children had its own "houseparents" and "relief houseparents" who lived with them. The houseparents were supposed to act like surrogate parents to the children.

### 2. *Trudy and Earl Pearson*

Trudy Pearson was a houseparent at MHCC from March 1968 through August 1969. Her husband, Earl Pearson, lived in her quarters with her. Earl Pearson was never an employee of MHCC.

Trudy Pearson testified that the head administrator of MHCC, James Blaine, interviewed her and hired her for the job. She further testified that Blaine interviewed her a second time with Earl Pearson present. The purpose of this interview was for Blaine to meet Earl Pearson, because he was going to be living at MHCC with Trudy Pearson. Earl Pearson testified that Blaine informed him that he would be required to "act as a good parent" and refrain from "inappropriate behavior" while living at MHCC.[1]

---

[1] The death certificate of James Blaine was entered into evidence.

Trudy Pearson was assigned as a houseparent for the junior girls, who ranged in age from four to 11. The Pearsons lived in the dormitory with the junior girls and had their own room just down the hall from where the girls slept.

Deutsch and Mohr-McDermott testified that, while living at the home, Earl Pearson performed all of the regular duties of a houseparent. Both Deutsch and Mohr-McDermott believed that both Trudy and Earl Pearson were their houseparents.

Earl Pearson testified that he was a full-time college student and also had a full-time job at Head Start during the 18 months that he lived at MHCC. After obtaining a college degree in 1969, he moved to Arizona to attend graduate school then embarked on a long career working with children with no accusations of misconduct.

### 3. *Randy Azelton*

In 1975, Randy Azelton was a 22-year-old junior college student. He responded to a newspaper advertisement for a job as a houseparent at MHCC. Azelton had previously worked part time on the weekends in the infirmary of another home for children. He interviewed for the MHCC job and was hired as a relief houseparent.

By this time, the dormitories at MHCC had been replaced by separate houses. When Deutsch was 16, Azelton was a secondary houseparent in Deutsch's house. Azelton worked at MHCC from November 5, 1975, through October 11, 1976.

### 4. *Mohr-McDermott's testimony as to Earl Pearson's sexual abuse*

Mohr-McDermott testified that Earl Pearson made inappropriate sexual contact with her on more than one occasion. The first time, it was in the houseparent quarters that the Pearsons shared. Mohr-McDermott had been reading in the library, and Earl Pearson invited her into his quarters to read with him. She was sitting on his lap in a rocking chair when he began rubbing her back and eventually "fondling" her on the outside of her underwear. Mohr-McDermott testified that after the first incident, Earl Pearson engaged in inappropriate sexual contact with her "many, many times." The inappropriate touching escalated to touching her genitals directly and eventually to penetrating her with his fingers.

Mohr-McDermott testified during her deposition that no adult ever observed Earl Pearson sexually abusing her. She stated that whenever Trudy

Pearson came by during an incident of sexual abuse, he would "stop what he's doing and pretend he's just being a nice guy reading." This testimony was read back to Mohr-McDermott at trial and she confirmed that it was truthful testimony. However, at trial Mohr-McDermott described one occasion when Earl Pearson took her to his room about 11:00 at night. He placed her at the foot of his bed and proceeded to molest her while Trudy Pearson was in the same bed, sleeping. Earl Pearson then took her to the Pearsons' private bathroom, closed the door, and continued to sexually molest her. According to Mohr-McDermott's testimony, "a little while after that . . . Trudy woke up and knocked on the door." After "some fidgeting" and after "some time," Earl Pearson opened the door. Trudy Pearson inquired as to what Mohr-McDermott was doing awake, and Earl Pearson responded that Mohr-McDermott could not sleep. Both Trudy and Earl Pearson denied that this event occurred. According to Mohr-McDermott, after the bathroom incident, Earl Pearson's molestations of her continued.

### 5. *Deutsch's testimony as to Earl Pearson's sexual abuse*

Deutsch claimed that Earl Pearson began molesting her when she was seven years old. He would come into the bedroom, pull up her nightgown, pull down her underwear, fondle her genitals, and insert his finger into her vagina. During the time that he made these nighttime visits, Deutsch never told anyone. Earl Pearson told her to "be quiet" and threatened to hurt her if she told anyone. Deutsch thought she heard Earl Pearson molesting other girls in their cubicles.

On one occasion, Earl Pearson molested Deutsch in a basement laundry room after taking the junior girls to the pool. He lifted her, up onto a table and took off her bathing suit. He proceeded to perform oral sex on her. He also put his finger into her vagina. As she was standing on the table, she observed the junior boys' group and their houseparent, Mildred Torkelson, proceed up some stairs which went past a laundry room window. Deutsch testified that when she saw these individuals out the window, she ducked. Earl Pearson momentarily stopped molesting her, but then started again.

On a different occasion, Deutsch was in a basement classroom reading with Earl Pearson. She was sitting on his lap, and he admonished her not to tell anybody about his actions, because he did not want to have to hurt her. He held the book with his left hand and molested her with his right hand, placing his hand down her shorts. While this was occurring, Torkelson came down the stairs and looked directly at them. Earl Pearson had his hand in Deutsch's pants during the time that Torkelson observed them. However, he stopped movement. Torkelson turned and headed into the laundry room, and Earl Pearson then removed his hand from inside of Deutsch's pants. Deutsch

confirmed that Torkelson never said or did anything in all the time that Deutsch knew her to suggest that she had seen anything improper.[2]

The last incident by Earl Pearson against Deutsch occurred in the Pearsons' bedroom. Earl Pearson closed and locked the door, removed Deutsch's pants and underwear, laid her on the bed, performed oral sex on her, and digitally penetrated her vagina. After this occurred, Earl Pearson went to the bathroom. At that point, there was a loud knocking at the door. Deutsch grabbed her clothes and put them on, unlocked the door, and ran out of the room. Trudy Pearson and another houseparent named Sharon Schaefer were outside the door. Later that day, Trudy Pearson and Schaefer questioned Deutsch about what Earl Pearson had done. Deutsch did not have the words to describe Earl Pearson's actions, but she recalls telling them that Earl Pearson had "put his finger" in her "hole." Deutsch also recalled the other junior girls being called in to speak with Trudy Pearson and Schaefer one at a time. After that incident, Deutsch never saw Earl Pearson again.

### 6. *Testimony regarding the conduct of Randy Azelton*

Azelton admitted at trial that he "got too friendly" with Deutsch, and "probably took advantage of her." According to Deutsch's testimony, the sexual contact between her and Azelton began with kissing and touching on the grounds of MHCC in areas open to the residents and staff of MHCC. This conduct went on for a couple of months in areas that were frequented by other members of the MHCC community. However, neither Deutsch nor Azelton knew whether anyone observed this behavior. Azelton testified that he attempted to make sure that he did not get caught engaging in this sexual behavior with Deutsch, and he believes that he was successful. Deutsch also testified that she made efforts to keep her sexual relations with Azelton secret.

Deutsch described one incident when Azelton had sexual intercourse with Deutsch in his room with the door open. Azelton's room was right across the hall from Deutsch's room. He called across the hall and told her to come to his room. Azelton and Deutsch began kissing and ended up having sexual intercourse. Mary Stacy, who was the other houseparent for Deutsch's group, walked down the hallway and glanced into Azelton's room. Deutsch was lying on Azelton's bed. Stacy then walked further down the hall, turned around, and walked back up the hallway very quickly. When Stacy came into the vicinity of Azelton's room, he jumped up, listened, and then looked down the hall to see if she had gone. On another occasion, Azelton had sexual intercourse in Deutsch's bedroom with the door half open. Stacy came down

---

[2] The parties stipulated, and the trial court instructed the jury, that Torkelson was 91 years old at the time of trial, suffered from Alzheimer's disease, and no longer had any long-term or short-term memory.

the hall again while Azelton was in her room. Azelton hid behind the door when Stacy entered the room. A few weeks later, Deutsch was moved to a different house without explanation.[3]

One day, at the dining hall, Deutsch overheard a conversation involving an employee of MHCC named James Tuttle. Tuttle referred to a diary that Deutsch kept at the time. He said something about flipping over Deutsch's mattress, under which she kept the diary. Deutsch overheard bits and pieces of his conversation regarding the diary, which described her intimate contact with Azelton.[4]

## PROCEDURAL HISTORY

Respondents were two of 20 plaintiffs who sued appellant in 2003. Before trial, the trial court granted defense motions for summary adjudication as to some of the alleged perpetrators of abuse against Deutsch and Mohr-McDermott. The court found that these claims were not revived by section 340.1(c) because there was insufficient evidence that appellant had knowledge or notice of the alleged sexual abuse by these perpetrators, and insufficient evidence that some of these defendants were employees, volunteers, agents, or representatives of appellant.

The trial court set trial dates for the plaintiffs in five separate groups. From August to October 2006, the court held the first trial on negligence claims brought by respondents against appellant based on alleged sexual abuse committed by Earl Pearson and Azelton. Trial was bifurcated into a liability phase and a damages phase, with the statute of limitations defense to be tried as part of the liability phase. The trial court also ruled that it would try appellant's due process defense, and would hear evidence in support of this defense concurrently with presentation of evidence to the jury.

Appellant argued that respondents' extreme delay in bringing the lawsuit, and the loss of evidence in the intervening years, made it entirely impossible for appellant to rebut certain of respondents' claims. Therefore, appellant sought to exclude two specific items of evidence relevant to respondents' contention that appellant had notice of the alleged sexual abuse: (1) the incidents Deutsch described in which Torkelson supposedly could have seen Earl Pearson abusing Deutsch from the basement stairs looking into the

---

[3] Mary Stacy did not provide testimony at trial.

[4] The trial court admitted into evidence the death certificate of James Tuttle. However, Mrs. Tuttle testified that she and her husband no longer worked for MHCC during the relevant time period. In fact, they left MHCC in 1972, three years before Azelton was hired. In closing argument, plaintiffs' counsel conceded that Deutsch was probably mistaken about which houseparent she had overheard.

laundry room; and (2) Deutsch's testimony concerning Tuttle's supposed reading of her diary. Appellant argued that the death and disability of these witnesses made these claims of notice irrefutable. Though the trial court found that neither witness was available, it denied appellant's motion on two grounds: first, because there were some "equitable differences" between the case relied upon by appellant, *Lane Hollow Coal v. Dir., OWCP, U.S. Dept. of Labor* (4th Cir. 1998) 137 F.3d 799 (*Lane Hollow*), and the present case; and second, because "the due process decision is more appropriate for a court of appeal post trial" when "the full state of evidence will be known."

The trial proceeded on only one cause of action: the negligent hiring, supervision, or retention of Earl Pearson and Randy Azelton. After a four-week trial, the jury returned a special verdict finding that (1) Earl Pearson had sexually abused Deutsch and Mohr-McDermott; (2) Earl Pearson was an employee, volunteer, representative, or agent of appellant; (3) Azelton had sexually abused Deutsch; (4) the sexual abuse by both perpetrators occurred after appellant knew or had reason to know of it; (5) appellant was negligent in the hiring, training, retention, or supervision of its employees, agents, volunteers, or representatives with respect to the sexual abuse by both perpetrators against both victims; and (6) the negligence of appellant was a substantial factor in causing the sexual molestations by both perpetrators against both victims. The jury was unanimous on all questions.

The trial court issued findings of fact, conclusions of law, and a ruling on the concurrent court trial on appellant's due process defense. The court's factual findings included a finding that "[b]etween 1979, when the statute of limitations on these claims expired, and 2003, when the statute of limitations on these claims was revived, there have been deaths of several material witnesses including Mr. James Tuttle, Ms. Dorothy Perry and Mr. James Blaine." The court also noted that "there has been one documented case of total loss of any effective memory, that being Ms. Mildred Torkelson." The court further found that there have been documents and records that have been lost and destroyed, and that "[t]he passage of time has undoubtedly made it difficult to defend these claims, but it has also made it difficult to prosecute the claims." Although the court found that respondents presented "no justification" as to why the claims were not filed in or before 1979, it ultimately held that "[i]f the only remedy . . . is dismissal of plaintiffs' claims entirely, the remedy conflicts with the legislative determination of due process made when the statute of limitations was revived and therefore is not a sensible remedy." Therefore, the court refused to dismiss the action on due process grounds.

In the damages phase of trial, the jury found that Deutsch had suffered $15,600 in economic damages and $1.9 million in noneconomic damages.

The jury found that Mohr-McDermott had suffered $15,600 in economic damages and $1.6 million in noneconomic damages. The jury found appellant 100 percent at fault for these damages, and assessed zero percent fault to Earl Pearson and Azelton.

Appellant objected to entry of judgment on the grounds that the verdicts were inconsistent because the jury assessed 100 percent of the fault to appellant while exonerating the claimed abusers of any fault. The court overruled these objections, and on October 25, 2006, entered judgments against appellant of $1,915,600 in favor of Deutsch and $1,615,600 in favor of Mohr-McDermott.

On December 5, 2006, appellant timely filed its notice of appeal from the judgments.

## DISCUSSION

### I. *The constitutionality of section 340.1(c)*

Appellant challenges the constitutionality of section 340.1(c) on two grounds: first, that it is unconstitutional on its face; and, in the alternative, that it is unconstitutional as applied in the context of respondents' 30-year-old claims. We address each claim separately below, and hold that the statute is constitutional both on its face and as applied.

#### A. *The statute is constitutional on its face*

Appellant claims that a defendant has a constitutional right to be free of the obligation to defend stale claims, and that this right eventually prevails over a plaintiff's right to prosecute them. In enacting section 340.1(c), appellant argues, the Legislature exceeded its power in that it revived a category of claims described by Code of Civil Procedure section 340.1, subdivision (b)(2) and declared that for a one-year period—calendar year 2003—there would be no statute of limitations measured from any definable point in time. Thus, appellant posits, section 340.1(c) would have permitted a 104-year-old woman to file suit in 2003, claiming she was fondled by a railroad porter in 1899. Further, appellant argues, section 340.1(c) has no prospective application, but applies exclusively to claims that have already expired. Citing *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 [62 Cal.Rptr.2d 243, 933 P.2d 507], appellant claims that the court is obliged to deny retroactive application of a statute where due process considerations prevent it. Appellant states that there is nothing in the legislative history to suggest that the Legislature even considered the due process ramifications of

reopening a claim in a factual setting such as this, where the decades-long delay resulted in the loss of so much defense evidence.

 An analysis of appellant's due process claim must begin with a determination of whether appellant held a protected liberty or property interest of which appellant has been deprived. We note that the Supreme Court has determined that "in a civil case, there is no constitutional right of repose. [Citations.]" (*Hellinger v. Farmers Group, Inc.* (2001) 91 Cal.App.4th 1049, 1061 [111 Cal.Rptr.2d 268], citing *Campbell v. Holt* (1885) 115 U.S. 620, 628–629 [29 L.Ed. 483, 6 S.Ct. 209], *Chase Securities Corp. v. Donaldson* (1945) 325 U.S. 304, 314 [89 L.Ed. 1628, 65 S.Ct. 1137], *Liebig v. Superior Court* (1989) 209 Cal.App.3d 828, 830 [257 Cal.Rptr. 574], and *Lent v. Doe* (1995) 40 Cal.App.4th 1177, 1183 [47 Cal.Rptr.2d 389].) Thus, appellant has no constitutional right to be free of the obligation to defend stale claims.[5] Because section 340.1(c) does not deprive a defendant of a protected liberty or property interest encompassed by the Fourteenth Amendment, it is not unconstitutional under the due process clause.

Other decisions upholding revival statutes confirm this conclusion. In *Chase Securities Corp. v. Donaldson, supra,* 325 U.S. 304, the United States Supreme Court considered a constitutional attack on a Minnesota statute which lifted the bar of the statute of limitations in pending litigation under Minnesota securities law. The defendant argued that such action amounted to a taking of its property without due process of law. (*Id.* at p. 305.) In rejecting the defendant's constitutional claim, the Supreme Court stated: "it cannot be said that lifting the bar of a statute of limitation so as to restore a remedy lost through mere lapse of time is *per se* an offense against the Fourteenth Amendment." (*Id.* at p. 316.) The high court confirmed that "[s]tatutes of limitation find their justification in necessity and convenience rather than in logic. . . . Their shelter has never been regarded as what now is called a 'fundamental' right . . . ." (*Id.* at p. 314.)

More recently, in *Hellinger v. Farmers Group, Inc., supra,* 91 Cal.App.4th at page 1049, the Court of Appeal, Second Appellate District, Division Four upheld Code of Civil Procedure section 340.9, which revived certain claims arising out of damages from the Northridge earthquake which were barred

---

[5] Appellant cites language from one United States Supreme Court case which noted that "[t]he Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation . . . ." (*Landgraf v. USI Film Products* (1994) 511 U.S. 244, 266 [128 L.Ed.2d 229, 114 S.Ct. 1483].) *Landgraf* involved retroactive application of provisions of the Civil Rights Act of 1991 which created new rights to recover compensatory and punitive damages for certain violations of title VII. The high court held that such provisions did not apply retroactively to title VII cases pending on appeal when the statute was enacted. (511 U.S. at p. 294.) Therefore, the case does not support appellant's argument that appellant held a constitutional right of repose in the current matter.

because the applicable statute of limitations had expired. (91 Cal.App.4th at p. 1056.) While the issue in that case involved the contract impairment clauses of both the federal and state Constitutions, rather than the due process clauses of those Constitutions, the court noted that "[i]t has been established law for over a century that a legislature may revive a civil claim that is barred by the statute of limitations." (91 Cal.App.4th at p. 1061.)

The authority discussed above leads us to conclude that section 340.1(c) does not, on its face, violate principles of due process. Having determined that section 340.1(c) is constitutional on its face, we turn to appellant's argument that the statute is unconstitutional as applied.

### B. *The statute is constitutional as applied*

A statute valid on its face may be unconstitutionally applied. (*People v. Wingo* (1975) 14 Cal.3d 169, 180 [121 Cal.Rptr. 97, 534 P.2d 1001].) Appellant argues that section 340.1(c) was unconstitutionally applied under the due process clause in this matter because evidence that appellant ought to have had to defend the claim was lost as a result of the passage of time. In support of this argument, appellant cites to both criminal and civil cases in which "delays resulted in loss of evidence, and thereby violated defendant's due process rights."

The civil cases cited by appellant involving violations of due process on the grounds of delay are distinguishable from the case before us because all involve delay on the part of a government actor. (See *Consolidation Coal Co. v. Borda* (4th Cir. 1999) 171 F.3d 175 [coal mine operator denied due process by government's delay and failure to notify it of claim]; *Island Creek Coal Co. v. Holdman* (6th Cir. 2000) 202 F.3d 873, 883 [Office of Workers' Compensation Programs' (OWCP) "actions resulted in a denial of due process" where OWCP's violation undermined coal company's ability to present its case fairly]; *Lane Hollow, supra,* 137 F.3d at p. 807 ["The government's grossly inefficient handling of the matter" resulted in denial of due process to Lane Hollow Coal].) This is a critical distinction in the context of appellant's due process claims. Indeed, as respondents argue, the due process clause only applies to "acts of the states, not to acts of private persons or entities." (*Rendell-Baker v. Kohn* (1982) 457 U.S. 830, 837–838 [73 L.Ed.2d 418, 102 S.Ct. 2764].) Respondents' actions in delaying the filing of these claims does not constitute state action.

In response, appellant argues that legislation is always state action. Thus, appellant claims, courts recognize that a retroactive change in the statute of limitations is an unconstitutional denial of due process of law, as applied to a specific case, if application to that case is not "reasonable." In support of this

argument, appellant cites three cases. The first, *Rosefield Packing Co. v. Superior Court* (1935) 4 Cal.2d 120 [47 P.2d 716], involved an amendment to the Code of Civil Procedure which retroactively mandated dismissal of lawsuits not brought to trial within five years of the filing of the action. The previous statute had required dismissal if a lawsuit was not brought to trial within five years of the filing of the answer. (*Id.* at p. 121.) Because it retroactively deprived the plaintiffs of a vested right to maintain a cause of action, the Supreme Court held that "there must be a reasonable time permitted for the party affected to avail himself of his remedy before the statute takes effect." (*Id.* at p. 122.) The second, *Niagara Fire Ins. Co. v. Cole* (1965) 235 Cal.App.2d 40 [44 Cal.Rptr. 889], also involved the retroactive application of a one-year statute of limitations which deprived the plaintiff of the right to pursue an action. While the Court of Appeal stated that "a statute shortening the period of limitations cannot be applied retroactively to wipe out an accrued cause of action that is not barred by the then applicable statute of limitations" (*id.* at p. 43), it held that in the case before it, the prospective application of the statute did not deny the plaintiff due process because she was provided a reasonable time within which to commence her action (*id.* at p. 44). The third case cited by appellant, *Aronson v. Superior Court* (1987) 191 Cal.App.3d 294, 297–298 [236 Cal.Rptr. 347], confirmed the rule that "retrospective application of a shortened limitations period is permissible provided the party has a reasonable time to avail himself of his remedy before the statute cuts off his right" (*id.* at p. 297) and affirmed a dismissal of the action where the plaintiff was allowed a reasonable time to sue (*id.* at p. 300). Thus, all three of the cases described above involved the potential denial of a vested property right protected by the due process clause: the right to pursue an action. In contrast, as we have discussed above, appellant's right of repose is not a constitutionally protected right.

The only state action at issue here was the passage of section 340.1(c). As we determined in part I.A. above, that action was not unconstitutional and did not deprive appellant of a vested liberty or property interest. Respondents' action in taking advantage of the revival provision cannot be considered state action, therefore it is not subject to the due process clause. Because respondents' delay is not actionable under the due process clause, this issue must be determined in favor of respondents.[6]

---

[6] We have determined that (1) the government's action in passing section 340.1(c) did not deprive appellant of a protected right; and (2) respondents' delay in filing their claims does not constitute state action. These findings are dispositive of appellant's claim that the statute is unconstitutional as applied, therefore we do not address appellant's argument that it need not prove what the lost evidence would have shown in order to establish prejudice.

## II. *Issues arising from the passage of time*

In addition to its due process claims as to the constitutionality of the statute and its application here, appellant raises due process claims in connection with the conduct of the trial. These due process claims include the following three issues: (1) whether due process required exclusion of the specific evidence which appellant was unable to rebut due to the passage of time; (2) whether appellant was denied due process of law by the court's exclusion of certain scientific evidence regarding changes in custom and practice since the time that the sexual abuse occurred; and (3) whether appellant was denied due process of law by the trial court's failure to instruct the jury on weighing evidence where potentially controverting evidence has been lost. We address each of these arguments in detail below, and conclude that these evidentiary determinations and instructions to the jury did not deprive appellant of due process of law or otherwise constitute reversible error.

### A. *Evidence that could not be rebutted due to the passage of time*

Appellant filed a motion in limine seeking to exclude all testimony or evidence that Tuttle or Torkelson had knowledge of the alleged sexual abuse by Earl Pearson or Azelton, including evidence that Tuttle found or read Deutsch's diary, and evidence that Torkelson saw Deutsch sitting in the lap of Earl Pearson at a time when he had just molested Deutsch or was in the process of doing so. Appellant argued that, because Tuttle died in 1995, and Torkelson suffered from Alzheimer's disease, both were unavailable to confirm, refute, or explain respondents' contentions. Thus, appellant argued, due process required the exclusion of this "unrebuttable" evidence.

In support of its argument that due process required exclusion of the evidence that lost evidence might have rebutted, appellant cites two criminal cases. Initially, we note that criminal cases present unique requirements regarding the preservation of evidence. As the United States Supreme Court has noted, it has long interpreted the due process clause of the Fourteenth Amendment as requiring that "criminal defendants be afforded a meaningful opportunity to present a complete defense." (*California v. Trombetta* (1984) 467 U.S. 479, 485 [81 L.Ed.2d 413, 104 S.Ct. 2528] (*Trombetta*).) Thus, the high court has developed "what might loosely be called the area of constitutionally guaranteed access to evidence" (*United States v. Valenzuela-Bernal* (1982) 458 U.S. 858, 867 [73 L.Ed.2d 1193, 102 S.Ct. 3440]) in order to ensure the integrity of our criminal justice system. In addition, in criminal cases, the failure to preserve evidence unquestionably constitutes state action. As set forth in part I.B. above, the delay in filing of respondents' lawsuit and the resulting loss of Tuttle and Torkelson as witnesses were not caused by any state action. Thus, appellant's claims regarding the exclusion of respondents' evidence are not actionable under the due process clause.

In addition to being distinguishable because they involve doctrines uniquely applicable to criminal defendants, the criminal cases cited by appellant are significantly distinguishable on their facts. The first case cited by appellant, *Brown v. Municipal Court* (1978) 86 Cal.App.3d 357 [150 Cal.Rptr. 216] (*Brown*), involved an action charging an automobile driver with driving under the influence of intoxicating liquor. The record showed that, following his arrest, the petitioner was taken to a police station where a breath test was administered. He then was taken to a hospital, where he requested a blood test at his own expense. The police officer refused to allow the test. (*Id.* at p. 360.) The Court of Appeal confirmed the trial court's determination that the denial of the opportunity to procure the blood test, which prevented the accused from obtaining evidence necessary to his defense, amounted to suppression of evidence and thus was a denial of due process of law. (*Id.* at p. 363.) The court concluded that dismissal of the case was not necessary, but indicated that "suppression of the results of the breath test administered to petitioner herein is all that due process demands, and is sufficient to secure to petitioner a fair trial." (*Ibid.*)[7]

The circumstances before us are different. Here, respondents did not engage in any action amounting to suppression of evidence. Their action in filing their claims against appellant over 30 years after the occurrence of the acts in question was sanctioned by the Legislature and was not a direct cause of the loss of appellant's potentially exculpatory evidence.

Appellant cites *People v. Peinado* (1976) 67 Cal.App.3d Supp. 1 [136 Cal.Rptr. 845] (*Peinado*), as support for its position that the trial court should have made findings against respondents on the issues that appellant could not rebut due to the passage of time. In *Peinado*, the defendant sought a dismissal of the charges against him on due process grounds for a governmental delay in filing the charges against him. In order to prevail on such a claim, the defendant was required to show that the delay was not necessary to promote a legitimate purpose. In order to prove this element of his claim, the defendant sought extensive statistical information from the state. When the state was

---

[7] Respondents argue that *Brown* is no longer good law because the *Brown* court relied heavily on *People v. Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], which was "effectively overruled" by *Trombetta*. (*People v. Kimble* (1988) 201 Cal.App.3d 726, 733 [248 Cal.Rptr. 41].) *Hitch* and *Trombetta* involved the police's action in disposing of the test ampule and its contents so that the defendant could not impeach the actual breath test results. In *Trombetta*, the United States Supreme Court found that this practice did not violate the Constitution because the state's obligation to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." (*Trombetta, supra*, 467 U.S. at p. 488, fn. omitted.) Because "the chances are extremely low that preserved samples would have been exculpatory" (*id* at p. 489), the breath samples did not meet this standard of constitutional materiality. This holding does not undermine *Brown*'s holding that a proper remedy for the intentional suppression of possibly exculpatory evidence is exclusion of the evidence that the defendant was unable to rebut.

unable to provide the information by the deadline set by the court, the court dismissed the action against the defendant. (*Id.* at pp. Supp. 9–10.) The appellate court reversed, finding that a more appropriate sanction under the circumstances would be the making of a finding against the prosecution as to each of the items ordered disclosed. (*Id.* at p. Supp. 11.) Again, the case is factually distinguishable because the prosecution's failure to comply with a specific discovery order of the trial court led to the prejudice against the defendant in making his case. Here, the death of Tuttle and memory loss of Torkelson did not result from any failure on respondents' part to comply with discovery. The loss of evidence from Tuttle and Torkelson was beyond respondents' control.

Appellant also cites several civil cases, all of which are distinguishable because they involve serious abuses of the litigation process. (*Deyo v. Kilbourne* (1978) 84 Cal.App.3d 771 [149 Cal.Rptr. 499] [discussing proper sanctions for failure to provide fully responsive answers to interrogatories]; *Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377 [97 Cal.Rptr.2d 12] [discussing trial court's imposition of evidence preclusion sanctions as a result of plaintiff's nonresponsive and evasive answers to interrogatories concerning proof that defendant knew or should have known of perpetrator's pedophilic tendencies]; *Sauer v. Superior Court* (1987) 195 Cal.App.3d 213 [240 Cal.Rptr. 489] [imposition of monetary sanction and issue sanction proper where plaintiff had willfully and without justification refused to follow discovery rules]; *Peat, Marwick, Mitchell & Co. v. Superior Court* (1988) 200 Cal.App.3d 272 [245 Cal.Rptr. 873] [trial court's order precluding defendant from controverting evidence on certain elements of the prosecution's professional malpractice case was not an abuse of discretion where defendant's merger with the prosecution's expert during the pendency of litigation was an abuse of the litigation process].) Appellant can point to no abuses of the litigation process here. While appellant asks that we find respondents' delay in bringing this lawsuit to be a prejudicial act, we reiterate that the revival of appellant's claim was specifically permitted by statute. No abuse of the litigation process occurred.

In sum, appellant has failed to cite a case which illustrates that, in a civil matter, due process requires that evidence should be excluded where the passage of time has rendered that evidence difficult, or even impossible, to rebut.

### B. *Exclusion of scientific evidence regarding custom and practice*

■ Appellant's next argument, which appellant casts as a due process argument, involved the trial court's decision that scientific literature offered by appellant's expert, Dr. Park Dietz, constituted hearsay and was therefore

inadmissible. We first note that appellant has cited no authority suggesting that an evidentiary ruling excluding scientific literature offered by an expert can constitute a due process violation. We therefore review the trial court's decision for abuse of discretion. (*People v. Nicolaus* (1991) 54 Cal.3d 551, 582 [286 Cal.Rptr. 628, 817 P.2d 893] ["It is well established that the court may, within its sound discretion, exclude the hearsay basis of an expert's opinion."].)

The evidence consisted of various scientific publications describing what was known and being done, or what was not known and not done, about child sexual abuse between 1960 and the present. Appellant made two arguments against the court's hearsay ruling: first, that the scientific literature was not hearsay because it was offered for a nonhearsay purpose, as evidence of custom and common knowledge; and second, that it was admissible under the exception to the hearsay rule found in Evidence Code section 1341 which provides that "books of science . . . are not made inadmissible by the hearsay rule when offered to prove facts of general notoriety and interest."[8]

Respondents argue that the trial court properly excluded the proffered evidence as inadmissible hearsay. As an example, respondents point to a statement in the book The Dark Side of Families, by Dr. David Finkelhor. In it, Finkelhor writes: "Sexual abuse was not frequently noticed by clinicians prior to 1975." (Finkelhor et al., The Dark Side of Families: Current Family Violence Research (1983) p. 85.) Respondents argue that appellant was seeking to use this statement for the truth of the matter asserted, not for any nonhearsay purpose. (Evid. Code, § 1200.) Because respondents had no opportunity to cross-examine Finkelhor on this statement, the trial court properly ruled that Dietz could not testify to this type of inadmissible hearsay on direct examination. Respondents cite *People v. Coleman* (1985) 38 Cal.3d 69, 92 [211 Cal.Rptr. 102, 695 P.2d 189], for the proposition that "[w]hile an expert may state on direct examination the matters on which he relied in

---

[8] Respondents argue that appellant waived this claim of error. Specifically, respondents claim that the trial court *only* sustained objections to two items of literature: (1) an excerpt from a 1980 book entitled The Silent Children: A Book for Parents About the Prevention of Child Sexual Abuse, which was found to be inadmissible under Evidence Code section 1341; and (2) an excerpt from a 1983 book called The Dark Side of Families: Current Family Violence Research, which was found to be inadmissible for lack of foundation. Respondents state that because appellant has not appealed either of these specific evidentiary rulings, the issue is waived. We decline to find that appellant has waived this claim. Appellant cites to trial testimony showing that appellant's attorney referred to other items of literature, "entire chapters and sometimes entire books," and indicated to the court that "[i]f the ruling the court intends to make is the same as it has made with regard to the quotation from the Silent Child, it would be fruitful to know that rather than belabor it and go through the sort of the ritual of asking questions and having objections made and sustained." The court indicated its intention to rule in the same fashion under Evidence Code section 1341, unless appellant made alternative arguments for the admission of this additional literature.

forming his opinion, he may not testify as to the details of such matters if they are otherwise inadmissible. [Citations.]" This prevents the expert from "under the guise of reasons bring[ing] before the jury incompetent hearsay evidence. [Citation.]" (*Ibid.*)

We find that appellant has failed to show that the trial court abused its discretion in excluding the scientific literature offered by appellant. The court stated that "I don't believe [Evidence Code section] 1341 applies to things that may interest the parties in this case and are highly disputed. It applies to things like time tables and . . . weather and almanacs." In other words, upon review of the material, the court found that it was not the type of information which would properly fit under the exception found in Evidence Code section 1341. Subsequent to this ruling, appellant filed a brief setting forth its arguments as to the admissibility of the literature in question under both Evidence Code section 1341 and "for a non-hearsay purpose as evidence of custom and 'common knowledge.' " After reviewing the brief, the court stated: "I've read defense's points and authorities regarding the discussion we had yesterday on the contents of books. The ruling remains the same." In other words, the court rejected appellant's argument regarding custom and common knowledge as well.

The trial court did not abuse its discretion in doing so. Appellant has cited no authority showing that a general "custom and common knowledge" exception to the hearsay rule exists. In support of its argument, appellant cites *Dillenbeck v. City of Los Angeles* (1968) 69 Cal.2d 472 [72 Cal.Rptr. 321, 446 P.2d 129], which involved a lawsuit by surviving relatives of a decedent who had died of injuries sustained in a car accident with a police car. The plaintiffs sought to introduce into evidence various training bulletins as proof that the police officer did not comply with some of the instructions contained in the bulletins and therefore drove negligently. The Supreme Court explained: "Introduced for the purpose of particularizing the standard of care, such safety rules theoretically constitute hearsay . . . . They are admissible, however, as an implied admission of a party opponent." (*Id.* at p. 478.) Applying this "well established legal doctrine of admissibility," and concluding that "at least two safety rules of the Los Angeles Police Department . . . relate to the instant factual situation . . . ," the court declared that it was error for the trial judge not to admit the bulletins. (*Ibid.*) The matter before us is distinguishable; appellant was not trying to admit literature that was tantamount to an admission, but was trying to admit documents containing a third party's opinions and analysis of the custom and practice at the time.

Appellant further cites *Dutcher v. City of Santa Rosa Sch. Dist.* (1957) 156 Cal.App.2d 256, 263 [319 P.2d 14], for the proposition that the existence of custom is " 'a matter of fact and not of opinion, hence witnesses must testify

to its existence as a fact. It must be proved by *instances* and not by opinion . . . .' " (Italics added.) This does not require the trial court to allow inadmissible hearsay to be put before the jury.

In sum, we find that the trial court's determination that the scientific literature offered by appellant was not admissible under Evidence Code section 1341, or for the nonhearsay purpose of establishing custom and practice, was not an abuse of its discretion.[9]

### C. *Failure to instruct the jury on weighing evidence where potentially controverting evidence is lost*

Appellant's next argument is that the trial court erroneously refused to instruct the jury on weighing the evidence because potentially controverting evidence had been lost during the many years between the time of the alleged acts and the time respondents brought their claims to trial. In light of the long passage of time and the loss of evidence, appellant asked that the trial court give the following instructions:

Defendant's proposed jury instruction No. 11: "When many years have elapsed without any attempt to enforce a claim, it is presumed that the claim was never originally valid. This presumption protects against the prosecution of stale claims when it might be impossible to establish the truth because of loss of evidence from the death of witnesses, imperfect recollection of other witnesses, and the destruction of documents."

Defendant's proposed jury instruction No. 12: "If a lapse of time is long enough to result in loss of evidence, you may consider the delay in the prosecution of the claim as evidence against the validity of a claim equal to that of credible witnesses."

Defendant's proposed jury instruction No. 13: "It is undisputed in this case that employee personnel files concerning Trudy Pearson, the wife of Earl Pearson, and concerning Randy Azelton were once kept by Masonic Home for Children in Covina but have been discarded or destroyed by Masonic Home for Children in Covina at some time between the time the employment of those persons ended and the time this lawsuit was begun. Those files might have contained evidence tending to prove the liability of a defendant in this

---

[9] Respondents also contend that any error would have been harmless because Dietz testified "at great length" before the jury regarding the changes in public awareness of child sexual abuse from the 1960's to the present. Appellant counters that respondents capitalized on the trial court's ruling, stating in closing argument that Dietz came to court "without any research" and thus his testimony "means nothing." However, because we have determined that the trial court's ruling was not error, we find that we need not address the question of prejudice.

case, or those files might have contained evidence tending to disprove the liability of a defendant in this case. Whether you may infer that the absence of these employment files has a meaning in your decision in this case should be guided by the following principles.

"1. Masonic Home for Children in Covina was not under any statutory or regulatory duty to preserve personnel files of employees for more than seven years after a person's employment ended.

"2. Documents may be discarded or destroyed where there are no known claims as to which the documents might be relevant.

"3. Documents should not be discarded or destroyed where they are known to be relevant to a pending or impending claim.

"4. Persons who will make claims as to which relevant documents are likely to exist should give notice to the person who will be asked to respond to the claim, that a claim will be presented, at a time before relevant documents are likely to be discarded or destroyed so that the documents may be gathered and preserved as evidence.

"If you find that the conduct of any party in this case is inconsistent with any of these principles then you may, but you are not required, to infer that evidence that once existed in the now absent personnel files of Trudy Pearson or Randy Azelton would have disproved the contentions presented by the party whose conduct you find to be inconsistent with these principles."

Appellant contends that the court's refusal to give these instructions was error and that such error was prejudicial because respondents attempted to take advantage of the loss of evidence, particularly the absence of personnel files for Trudy Pearson, Azelton, and other employees who worked at MHCC during the 1960's and 1970's, asking the jury to infer facts adverse to defendant because the records had been discarded.

When reviewing a claim of instructional error such as this, we apply the prejudicial error standard. Under this standard, we analyze whether the instruction was erroneous, and, if so, whether the error was so prejudicial as to result in a miscarriage of justice. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [34 Cal.Rptr.2d 607, 882 P.2d 298].)[10]

We find that the trial court did not err in refusing to give the proposed instructions. In support of its position, appellant directs us to law in support

---

[10] We decline to review this purported error under the standard applicable to a due process claim. Again, appellant has failed to cite any authority that this claimed instructional error is a constitutional violation.

of the proposition that a defendant has the right to be free of the need to defend stale claims. Appellant cites *Riddlesbarger v. Hartford Insurance Co.* (1868) 74 U.S. 386 [19 L.Ed. 257], an action upon an insurance policy which contained language specifying that any claim was required to be filed within 12 months after the alleged loss or damage occurred. (*Id.* at p. 387.) In upholding the dismissal of the action, which was commenced over two years after the purported loss, the Supreme Court recited the policies favoring statutes of limitations. (*Id.* at p. 390.) Here, where the Legislature has expressed a specific intent to revive the relevant claims for overriding policy reasons, such general principles do not apply. The other cases cited by appellant do not convince us otherwise. (See *Addison v. State of California* (1978) 21 Cal.3d 313, 317 [146 Cal.Rptr. 224, 578 P.2d 941] [also discussing the "primary purpose of statutes of limitation" when stating that the " 'right to be free of stale claims in time comes to prevail over the right to prosecute them' "]; *Telegraphers v. Ry. Express Agency* (1944) 321 U.S. 342, 349 [88 L.Ed. 788, 64 S.Ct. 582] [also discussing the purpose of statutes of limitations]; *Emerson v. Kennedy Min. & Mill. Co.* (1915) 169 Cal. 718, 722–723 [147 P. 939] [discussing the purpose of the equitable defense of lapse of time].)

Because we find no error in the trial court's decision to deny the proposed instructions, we need not discuss the question of prejudice.

### III. *Instructional error as to section 340.1(c)*

Appellant argues that the trial court erroneously instructed the jury on the elements necessary to revive a lapsed claim under section 340.1(c) in two ways: first, on the requirement that the defendant "knew or had reason to know, or was otherwise on notice," of the unlawful sexual conduct at issue; and second, on the requirement that the offender was an "employee, volunteer, representative or agent" of the defendant. We discuss each claim of instructional error separately below.

As set forth below, we find that the trial court's instruction on the notice element of section 340.1(c) was erroneous and that, under the circumstances of this case, it is reasonably probable that a result more favorable to appellant would have been reached in the absence of such error. Because we find that the instructional error probably affected the outcome of the case, we must reverse the judgment.

As to appellant's second claim of instructional error regarding section 340.1(c), we find no reversible error.

## A. *Knowledge/notice requirement*

In order for a claim of childhood sexual abuse to be revived under section 340.1(c), a plaintiff must show that the defendant "knew or had reason to know, or was otherwise on notice, of any unlawful sexual conduct by an employee, volunteer, representative, or agent, and failed to take reasonable steps, and to implement reasonable safeguards, to avoid acts of unlawful sexual conduct in the future by that person." (Code Civ. Proc., § 340.1, subd. (b)(2).)

The trial court's instruction to the jury on the meaning of "reason to know" read:

"Defendants had reason to know of any unlawful sexual conduct if they either:

"(a) had actual notice of circumstances that would alert a prudent person to investigate, and that a reasonable investigation might have revealed to them that unlawful sexual conduct was occurring,

"OR

"(b) you find the unlawful sexual conduct or its effects was so obvious and pervasive that any reasonably attentive person would have noticed it."

Appellant argues that the first paragraph improperly uses a "should have known" standard, which the language of the statute does not encompass. Further, appellant contends, the court's instruction that appellant had notice if the conduct was "obvious," even if appellant knew nothing at all, contravenes the plain language of the statute. Appellant also asserts that the instructions imposed a duty to investigate which is not required under the actual notice standard of the statute.

After briefing was complete in this appeal, the Supreme Court issued its decision in *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531 [67 Cal.Rptr.3d 330, 169 P.3d 559] (*Doe*). *Doe* involved two 40-year-old former Boy Scouts seeking to bring an action against the city and Boy Scouts of America based on allegations that a city police officer, David Kalish (Kalish), sexually abused them when they participated as teenagers in a joint police explorer and scouting program. In affirming the order sustaining demurrers to the plaintiffs' causes of action, the Supreme Court held that the pleadings were insufficient to invoke the extended statute of limitations found in section 340.1(c). The high court engaged in an extensive discussion of the require-ment that the victim establish that the defendant had "actual knowledge,

constructive knowledge (as measured by the reason to know standard), or was otherwise on notice that the perpetrator had engaged in past unlawful sexual conduct" with the minor. (42 Cal.4th at p. 549.)

The parties to this appeal filed supplemental briefs on the impact of *Doe* on the matter before us. *Doe* provides controlling authority as to the interpretation of the notice requirements sufficient to invoke the extended statute of limitations in section 340.1(c), and, as discussed further below, convinces us that the trial court's instructions to the jury here were erroneous.

### 1. *The trial court's instructions were erroneous under* Doe

The first *Doe* plaintiff alleged that " '[d]efendants and each of them knew or should have known that Kalish presented a risk of sexual exploitation to boys in the . . . program. . . . Defendants and each of them further knew or should have known that Kalish had a friendship and/or business interests with [a] known pornographer . . . which should have prompted immediate inquiry . . . .' " (*Doe, supra*, 42 Cal.4th at p. 539.) The second *Doe* plaintiff alleged that the defendants " 'should have known, prior to the incidents complained of here, that pedophiles were active in [their organizations].' " (*Id.* at p. 540.) The second *Doe* plaintiff further alleged that " '[d]efendant LAPD knew and Defendant BSA should have known of the following: a) that a police officer was having sex with an Explorer Scout in the Hollywood Division's Explorer Scout Program[;] b) that another two police officers were having sex with a different Explorer Scout in the Hollywood Division's Explorer Scout Program; and c) that another police officer had sex with an Explorer Scout in the Devonshire Division's Explorer Scout Program while on a sanctioned scout camping trip and got her pregnant.' " (*Ibid.*)

The *Doe* court explained that the action filed by the plaintiffs was barred unless these allegations satisfied Code of Civil Procedure section 340.1, subdivision (b)(2)'s requirement that the defendants "knew or had reason to know, or [were] otherwise on notice" of the alleged sexual misconduct. The court thus proceeded to address "what the Legislature meant by this statutory language and whether, in light of that meaning, plaintiffs adequately alleged that defendants had knowledge or notice that Kalish had engaged in past unlawful sexual conduct with minors prior to his alleged abuse of them." (*Doe, supra*, 42 Cal.4th at p. 543.)

The high court emphasized that the words "knew," "reason to know," and "otherwise on notice" must, "of course, be read in the context of the provision as a whole." (*Doe, supra*, 42 Cal.4th at p. 546.) "Thus, the subject of which the nonperpetrator defendant must have had knowledge or notice is, the statute clearly tells us, the perpetrator's *unlawful sexual conduct* as that

term is defined in the statute to encompass particular prohibited sexual acts with a minor." (*Ibid.*) Bearing this in mind, the court turned to the knowledge and notice language. The parties agreed that "knew" refers to actual knowledge. They further agreed that "reason to know" refers to a species of constructive knowledge, but disagreed as to its exact type. The Supreme Court concluded that "reason to know" was not the same as the inquiry notice standard described in Civil Code section 19.[11] (*Doe, supra*, at p. 547.) "Rather, in determining whether an actor was in possession of the constructive knowledge described by the 'reason to know' standard, we ask whether, after examining the facts in the actor's possession, a reasonable person of ordinary intelligence . . . would have inferred the existence of the ultimate fact at issue or regarded its existence as so highly probable as to conduct himself or herself as if it did exist." (*Ibid.*)

As to the words "otherwise on notice," the high court described this phrase as "admittedly ambiguous." (*Doe, supra*, 42 Cal.4th at p. 548.) It thus turned to the legislative history of the statute, which revealed that the language was added " 'to address a concern that an entity might be able to avoid responsibility if a formal complaint had not been filed.' " (*Ibid.*, quoting Assem. Com. on Judiciary, Rep. on Sen. Bill No. 1779 (2001–2002 Reg. Sess.) as amended June 6, 2002, p. 10.) Thus, "[t]he apparent purpose of this language was to prevent a nonperpetrator defendant from disclaiming knowledge of the unlawful sexual conduct of the perpetrator on the grounds that it had not been notified of this conduct through a formal complaint process where the evidence demonstrates that some other form of notice was provided." (*Doe, supra*, at p. 548.) The high court thus rejected the plaintiffs' claim that the statute imposed a duty of inquiry or that the Legislature intended to include imputed actual knowledge. (*Ibid.*) However, the court went no further in its analysis because the plaintiffs had failed to satisfy "the further requirement that the nonperpetrator defendant have knowledge or notice of the perpetrator's past unlawful sexual conduct." (*Ibid.*)

 The trial court's instructions to the jury on knowledge and notice do not withstand scrutiny under *Doe*. First, the instructions allowed the jury to find that the extended statute of limitations applied if appellant had "actual notice of circumstances that would alert a prudent person to investigate, and that a reasonable investigation might have revealed to them that unlawful sexual conduct was occurring." This language was overinclusive in light of the Supreme Court's decision that Code of Civil Procedure section 340.1 does not impose a duty of inquiry. (*Doe, supra*, 42 Cal.4th at p. 547.) Second,

---

[11] Civil Code section 19 states: "Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact."

the instructions allowed the jury to find that the extended statute of limitations applied if it found that the unlawful sexual conduct "was so obvious and pervasive that any reasonably attentive person would have noticed it." This standard differs from the Supreme Court's description of the "reason to know" language included in the statute, which asks "whether, after examining the facts in the actor's possession," a reasonable person would have inferred that the sexual abuse had occurred. (*Ibid.*) Thus, the statute does not directly impute knowledge to the nonperpetrator defendant based on what that defendant should have noticed, but requires an assessment of the facts that the defendant *did* know in order to determine whether a reasonable person would have inferred the unlawful conduct.[12] Contrary to respondents' argument that the trial court's instruction was not "materially different" from the Supreme Court's interpretation of the "reason to know" standard, we find that the trial court's instruction was indeed materially different, and constituted instructional error.

■ In their supplemental briefing, respondents seek to take advantage of the Supreme Court's decision not to "determine the precise contours" of the phrase "otherwise on notice." (*Doe, supra,* 42 Cal.4th at p. 548.) Respondents argue that this phrase should be further interpreted to incorporate the "should have known" standard set forth in the Restatement Second of Agency, section 213, or "some form of the inquiry notice standard of Civil Code section 19." We reject this argument. First, the Supreme Court made it clear that "the legislative history does not support . . . plaintiffs' claim that the 'otherwise on notice' language imposes a duty of inquiry . . . ." (*Doe, supra,* 42 Cal.4th at p. 548.) Further, the high court made it clear that the purpose of the "otherwise on notice" language was to "prevent a nonperpetrator defendant from disclaiming knowledge of the unlawful sexual conduct of the perpetrator on the grounds that it had not been notified of this conduct through a formal complaint process where the evidence demonstrates that some other form of notice was provided." (*Ibid.*) In other words, the defendant must have had notice—whether in the form of a formal complaint, knowledge of facts from which a reasonable person would have inferred past unlawful sexual conduct, or other actual notice of the perpetrator's conduct. Contrary to the trial court's instruction, facts giving rise to a duty to investigate, or unlawful conduct "so obvious and pervasive that any reasonably attentive person

---

[12] In addition to these errors regarding instruction on knowledge and notice, the trial court appears to have erred in its description of the events of which the nonperpetrator defendant was required to have knowledge. As set forth in *Doe*, "the knowledge or notice requirement refers to knowledge or notice of *past* unlawful sexual conduct by the individual currently accused of other unlawful sexual conduct." (*Doe, supra,* 42 Cal.4th at p. 549.) In contrast, the instructions to the jury in this matter focused on the current unlawful sexual conduct, rather than past acts. Because this question is not before us, we do not address it in detail. However, we make note of it so that, upon remand, the trial court may properly instruct the jury under *Doe*.

would have noticed it," is insufficient to revive respondents' claims under Code of Civil Procedure section 340.1.

Under *Doe*, notice is measured by the facts known to the defendant—either knowledge of the fact that prior unlawful conduct had occurred, or knowledge of facts from which such prior unlawful conduct should be inferred—not by facts which the defendant should have discovered or should have noticed. Under the instructions given by the trial court, appellant had the requisite notice even if appellant noticed nothing at all, so long as the conduct was "obvious." Despite its decision not to fully elaborate on the phrase "otherwise on notice," the Supreme Court has sufficiently explained the notice requirements of the statute for this court to conclude that the trial court's instructions in this matter were erroneous.

## 2. *The error was prejudicial*

Under article VI, section 13 of the California Constitution, if there is error in instructing the jury, the judgment shall be reversed only when the reviewing court, " 'after an examination of the entire cause, including the evidence,' " concludes that the error resulted in " 'a miscarriage of justice.' " (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1054 [1 Cal.Rptr.2d 913, 819 P.2d 872] (*Mitchell*).) To determine whether an erroneous instruction requires reversal, we "must determine whether it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error. [Citation.]" (*Ibid.*) Although there is no precise formula for determining the prejudicial effect of instructional error, we are guided by five factors: (1) the degree of conflict in the evidence on the critical issue; (2) whether the jury asked for a rereading of the instruction; (3) the closeness of the jury's verdict; (4) whether opposing counsel's closing argument contributed to the instruction's misleading effect; and (5) the effect of other instructions in remedying the error. (*Id.* at pp. 1054–1056.) In assessing an instruction's prejudicial impact, "we state the facts most favorably to the party appealing the instructional error alleged . . . ." (*Galvez v. Frields* (2001) 88 Cal.App.4th 1410, 1413 [107 Cal.Rptr.2d 50].)

We first analyze the evidence on the critical issue: whether appellant had the requisite level of knowledge or notice of the alleged sexual abuse. The evidence on this issue was supplied exclusively by the testimony of respondents themselves, and was contradicted by other evidence.

### a. *Evidence on the critical issue*

In order to properly analyze the question of prejudice, we take into account all evidence presented to the jury on the question of appellant's notice or knowledge of the unlawful sexual conduct of Earl Pearson and Azelton.

Mohr-McDermott conceded that she never told anyone of Earl Pearson's abuse. She testified that Earl Pearson abused her in the living room of the girls' dormitory while the other girls were present watching television, but she never claimed that any adult observed it. She also said Earl Pearson abused her while reading her books in a rocking chair, and that Trudy Pearson would sometimes come into the room, but that Earl Pearson, hearing Trudy Pearson's approaching footsteps, would immediately remove his hand before she entered. Mohr-McDermott contended that since this conduct occurred in open areas, someone could have observed it had he or she been outside in the hallway unheard. Further, Mohr-McDermott testified that Earl Pearson once abused her at the foot of the Pearsons' bed while Trudy Pearson slept on it, then took her into the bathroom and closed the door. She said Trudy Pearson then woke up, knocked on the door, and, when Earl Pearson opened it, asked them what they were doing. Earl Pearson then offered a lie, which Trudy Pearson accepted. Both Trudy and Earl Pearson denied that this ever occurred.

Deutsch also testified that she had been abused by Earl Pearson at several different times, but she could not claim with any certainty that anyone actually saw it happen. However, she testified to two incidents which, she claimed, may have given an adult an opportunity to observe what was happening. The first incident took place in a basement classroom, where she was sitting on Earl Pearson's lap on a desk chair. Deutsch said that Earl Pearson was reading her a book, holding the book in one hand, with his other hand inside her shorts. While this was occurring, Torkelson, houseparent for another group of children, descended some nearby stairs and had the opportunity to observe Deutsch and Earl Pearson for about "five seconds" before turning toward the laundry room. According to Deutsch, Earl Pearson did not move his hand or remove it from her shorts during the few seconds that Torkelson was present. Deutsch confirmed that Torkelson never did or said anything thereafter to suggest that she knew or suspected that Earl Pearson had been acting improperly. As discussed above, Torkelson was unable to testify due to Alzheimer's disease which the trial court found had left her with "total loss of any effective memory."

The second observable incident which Deutsch described involved a molestation which occurred in the basement laundry room. Deutsch claimed that during the incident, she observed eight to 10 junior boys outside through the window, accompanied by Torkelson, walking up the dormitory stairs. Deutsch was permitted to testify that Earl Pearson was "aware of their presence" while he was abusing her. However, Deutsch never said that any of the boys or Torkelson looked into the laundry room window to see what Earl Pearson was doing.

Deutsch described the "final time" Earl Pearson molested her as occurring in the Pearsons' bedroom behind a locked door. She claimed that after the abuse occurred, while Earl Pearson was in the bathroom, Trudy Pearson knocked on the door, yelling. Deutsch said she put on her pants and ran out of the room with her pants undone, where she saw adults Trudy Pearson and Sharon Schaefer. According to Deutsch, Trudy Pearson and Schaefer then questioned each of the junior girls one at a time, including plaintiff Mohr-McDermott and her sister, Janet. Deutsch claimed that she told the adults that Earl Pearson "put his finger in [her] hole." Deutsch said that Earl Pearson left the home immediately, probably the same day, and she never saw him again. Of the percipient witnesses who testified at trial, none confirmed Deutsch's story. Both Mohr-McDermott and Schaefer (Sharon Duncan at trial) said no such event occurred. Trudy Pearson said no such event occurred, and Earl Pearson denied committing any abuse. On the contrary, both Earl and Trudy Pearson testified that they continued living at the dormitory until the end of the summer of 1969, when Earl Pearson graduated from Azusa Pacific College.[13] Deutsch admitted that prior to this "final molest," she had never told anyone of Earl Pearson's acts.

With respect to her sexual relationship with Azelton, Deutsch claimed that appellant could have had notice in two ways: first, through an episode in which now deceased Tuttle found and read her diary; and second, because her sexual encounters with Azelton occurred in places where the two might have been seen, had someone looked.

In general, Deutsch testified that she and Azelton took pains to keep their relationship secret. However, she and Azelton sometimes touched each other while walking on the grounds when no one else was around. Neither Deutsch nor Azelton was aware of anyone ever observing this behavior.

Deutsch recalled an incident when she and Azelton had sexual intercourse in Azelton's room with the door open. While they were in bed, a houseparent walked down the hallway and glanced into Azelton's room. Deutsch testified that she could see the houseparent from the bed. The houseparent walked past, then turned around and walked back very quickly. On her way back, she looked into Deutsch's room on the other side of the hallway. Deutsch testified that when the houseparent came into the vicinity of Azelton's room, he "jumped up, listened, and then looked down the hall to see if she'd gone."

---

[13] Deutsch said Trudy Pearson was pregnant when this "final molest" was discovered. Since Trudy Pearson's child was born in December 1968, this would mean that the purported discovery of Earl Pearson's abuse, and his departure, would have occurred sometime between March and December of 1968. The Pearsons testified that they left MHCC at the end of the summer of 1969, at a time when Deutsch was not living at MHCC.

Deutsch also testified about an incident when Azelton came into her room. The door to her bedroom was "halfway open." She stated that she and Azelton were not observed while having sexual intercourse, but that when Azelton was in her room a houseparent walked down the hall and looked into the room. However, Azelton "jumped behind the door." A week or two later, Deutsch was moved from the house where Azelton worked. Azelton visited her one final time in her new room. He entered through a sliding glass door attached to a small patio. He stayed about 10 minutes before leaving at Deutsch's request. After Azelton left through the patio door, Deutsch observed her new houseparent walking around the corner of the house. Deutsch believed that Azelton and the new houseparent saw each other, but she never saw Azelton again at MHCC.

Deutsch also claimed that she wrote in her diary about "whether [Azelton] kissed me or not." She testified to overhearing Tuttle talking about having read this diary. She did not testify as to when this conversation was overheard, so it is not possible to determine at what point in time Tuttle purportedly acquired this notice. Since Tuttle died in 1995, he could not confirm or refute Deutsch's testimony. However, his widow, houseparent Edith Tuttle, testified without contradiction that she and her husband left MHCC in 1972, three years before Azelton was hired in 1975. In closing argument, respondents' counsel acknowledged that Deutsch was probably mistaken about whom she had overheard talking about her diary.

The evidence described above shows opportunities for Torkelson, Trudy Pearson, Schaefer, and Tuttle to acquire knowledge of the perpetrators' unlawful activities. It does not provide uncontested evidence that any of these individuals actually knew of the wrongful acts.[14] Moreover, there is no evidence that anything they knew was imputed or reported to appellant.[15] We therefore find that it is unlikely that the jury properly evaluated the notice requirement under section 340.1(c). The jury likely utilized the instructions given by the trial court and concluded that appellant had notice of circumstances that would "alert a prudent person to investigate" or that such conduct was "so obvious and pervasive that any reasonably attentive person would have noticed it." Had the jury been properly instructed regarding the knowledge element, it is reasonably probable that a result more favorable to appellant would have been reached. (*Mitchell, supra,* 54 Cal.3d at p. 1054.)

---

[14] As set forth above, we do not mean to impose a standard requiring respondents to show actual knowledge of the unlawful sexual conduct of the perpetrators. However, as explained in *Doe,* respondents must show knowledge of some fact or facts which would lead a reasonable person to infer that illegal sexual conduct had occurred. (*Doe, supra,* 42 Cal.4th at p. 547.)

[15] The question of whether their knowledge was legally imputed to appellant is not before us on appeal. We therefore express no opinion about whether the knowledge of Torkelson, Trudy Pearson, Schaefer, or Tuttle can be legally imputed to appellant. This is an open question on remand.

b. *The remaining* Mitchell *factors*

Having considered the evidence on the critical issue, we next consider whether the jury asked for a rereading of the erroneous instruction. The jury did not make such a request, but because the issue here does not involve a confusing or misleading instruction, we find this factor to be irrelevant.

Third, we consider the closeness of the jury's verdict. The verdict was unanimous in favor of respondents. However, because under the overbroad instructions given each juror could easily have made the finding that appellant should have investigated or should have noticed the conduct at issue, this factor is less significant. The jury clearly believed that improper conduct occurred, and heard testimony that such conduct could have been observed, therefore it would be logical for each juror to conclude that appellant should have investigated or should have noticed the conduct. However, appellant is simply not subject to this lawsuit under that standard.

Fourth, we consider whether respondents' counsel's closing argument contributed to the prejudice. We find that it did. As appellant points out, respondents' counsel emphasized in closing argument that appellant should have noticed, or should have investigated, the conduct at issue, equating appellant's ignorance to that of Germans who were ignorant of the Holocaust in World War II:

"Now, this concept of ignorance just isn't true because of all the things we told you were going on in the home by the individuals and in the community. The community knew. The people at the home knew. To suggest that nobody knew is just nonsense.

"And it reminds us that in the 1930's and 40's in towns and villages and cities in Germany, in Eastern Europe, people began to disappear. And in other towns and villages and cities, camps grew up and those people began to be locked away there. And a decade later and in the ensuing years the world asked the people in the cities where they came from, what happened? How could this go on? And the people said we didn't know. We couldn't know. Nobody talked about it. And they asked the people in the camp towns and villages and cities, what happened? How could this go on? And the people said we didn't know. We couldn't know. Nobody told. And the world didn't believe them. You shouldn't believe them either."

Thus, rather than pointing to any specific facts or incidents within appellant's knowledge, respondents' counsel suggested that "things we told you were going on in the home" created sufficient grounds for a finding of knowledge, and implied that the conduct was so obvious or egregious that appellant should have known or discovered it.

At another point in respondents' closing argument, when discussing Deutsch's allegations concerning her molestation by Earl Pearson in the laundry room, counsel stated: "[Y]ou've heard all the testimony about the vantage points, about the fact that those people at that vantage point had the ability as well as the opportunity to look into that laundry room." In addition, counsel stated: "Where was Trudy Pearson when Mr. Pearson was walking these halls and molesting these children? You'd have to be blind not to have seen this." And as to Azelton's inappropriate conduct with Deutsch, counsel stated: "[The inappropriate conduct] happened in other places that were open and available to the public, the residents and staff at the Masonic Home. He wasn't a very good hider, frankly. And there was no question that the people—the other people at this location had an obligation to do something about it." As set forth in *Doe*, this "should have known" standard advocated by respondents' counsel is not applicable under the statutory language of section 340.1(c), and it was improper for the jury to consider it.

The final factor that we consider in our analysis of prejudice is the effect of other instructions remedying the error. Neither party has drawn any such instructions to our attention therefore we find that no instructions remedied the error.

The above analysis convinces us that the jury's determination that appellant had the requisite notice under Code of Civil Procedure section 340.1 may have been based on the court's erroneous instruction that (1) appellant had a duty to investigate; or (2) appellant could be found liable where the conduct was "obvious and pervasive." Without a finding that appellant had the requisite notice under the standards set forth in *Doe*, respondents' claims would be barred by section 340.1, subdivision (a). We therefore find that the error was prejudicial, and reverse the judgment.

## B. *Agency requirement*

Our determination that the trial court's instructions on knowledge and notice were erroneous and prejudicial does not entirely dispose of the question of instructional error regarding revival of a claim under section 340.1(c). Appellant further argues that the court erroneously instructed the jury on the question of agency. Because the case will be remanded for a new trial, we address appellant's arguments regarding the trial court's instructions on the agency requirement.

In order for a claim of childhood sexual abuse to be revived under section 340.1(c), a plaintiff must show that the defendant "knew or had reason to know, or was otherwise on notice, of any unlawful sexual conduct by an *employee, volunteer, representative, or agent,* and failed to take reasonable

steps, and to implement reasonable safeguards, to avoid acts of unlawful sexual conduct in the future by that person." (Code Civ. Proc., § 340.1, subd. (b)(2), italics added.)

Earl Pearson was the spouse of houseparent Trudy Pearson, and was not an employee of appellant. However, the trial court instructed the jury that "[a]n agent may be an actual agent or an ostensible agent."[16] Although appellant argued that reviving a claim against the employer of an "ostensible agent" was not supported by the language or purpose of the revival statute, the trial court dismissed those arguments without comment. Appellant argues that a statute reviving lapsed claims must be given the least retroactive effect that its language reasonably permits. (*Douglas Aircraft Co. v. Cranston* (1962) 58 Cal.2d 462, 467 [24 Cal.Rptr. 851, 374 P.2d 819].) Because the Legislature did not expressly mandate, in unmistakable terms, that there be revival of claims against the employer of an "ostensible agent," appellant contends that the trial court erred in allowing the jury to permit revival of this claim based on the acts of Earl Pearson as an ostensible agent.

Thus, the question before us is whether the term "agent" in section 340.1(c) includes an ostensible agent. Respondents argue that the word "agent" as used in the revival statute must be given its usual legal meaning as set forth in the Civil Code. (See *Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 19 [56 Cal.Rptr.2d 706, 923 P.2d 1].)

Civil Code section 2295 states that "[a]n agent is one who represents another, called the principal, in dealings with third persons." Civil Code section 2298 further explains that "[a]n agency is either actual or ostensible." Actual agency is defined under Civil Code section 2299 as being "when the agent is really employed by the principal." Ostensible agency is when "the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (Civ. Code, § 2300.)

The statutory scheme contained in section 2295 et seq. of the Civil Code reveals that the doctrine of ostensible agency provides a means for legal formation of the agency relationship. Decisional law confirms that an agency relationship may be formed when the agent has either actual or ostensible authority. (See, e.g., *van't Rood v. County of Santa Clara* (2003) 113

---

[16] The instruction in its entirety read: "An agent may be an actual agent or an ostensible agent. To establish ostensible agency, Plaintiffs must prove all of the following: [¶] 1. That Defendant intentionally or carelessly created the impression in Plaintiffs' minds that Earl Pearson and Randy Azelton were Defendant's agents; [¶] 2. That Plaintiffs reasonably believed that Earl Pearson and Randy Azelton were Defendant's agent; and [¶] 3. That Plaintiffs were harmed because they reasonably relied on their belief."

Cal.App.4th 549, 572 [6 Cal.Rptr.3d 746] ["An actual agent may have either actual or ostensible authority to act for the principal."].) We presume that the Legislature was aware of the decisional law regarding the theory of ostensible agency when it drafted section 340.1(c). (*Pieri v. City and County of San Francisco* (2006) 137 Cal.App.4th 886, 893 [40 Cal.Rptr.3d 629].)

We therefore find that the trial court did not err in instructing the jury on the doctrine of ostensible agency. The instruction did not expand the statute to encompass a new type of relationship in addition to the four relationships which the Legislature determined should trigger revival: employee, volunteer, representative, or agent. (§ 340.1(c).) Instead, it simply explained one way that the agency relationship may be formed.

■ We further find that the purpose of the statute is served by an interpretation which permits the revival provision to apply to the acts of ostensible agents of nonperpetrator defendants. The purpose of the bill was to "ensure that victims severely damaged by childhood sexual abuse are able to seek compensation from those responsible." (Sen. 3d reading analysis of Sen. Bill No. 1779 (2001–2002 Reg. Sess.) as amended June 17, 2002, p. 1.) A principal is *responsible* for the acts of an ostensible agent when three elements are met. As the Supreme Court has explained: " 'It is elementary that there are three requirements necessary before recovery may be had against a principal for the act of an ostensible agent. The person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; such belief must be generated by some act or neglect of the principal sought to be charged; and the third person in relying on the agent's apparent authority must not be guilty of negligence. [Citation.]' [Citations.]" (*Associated Creditors' Agency v. Davis* (1975) 13 Cal.3d 374, 399–400 [118 Cal.Rptr. 772, 530 P.2d 1084].)

Applying these criteria to the matter before us, we find that the Legislature intended to allow revival of claims on the basis of the type of relationship that existed between Earl Pearson and appellant. Appellant permitted Earl Pearson to reside in a dormitory with the children for whom appellant was responsible. Appellant also did not object to, or intervene in, Earl Pearson's participation in the daily routines of the children. Thus, the residents of MHCC followed his orders and treated him as a houseparent. Under the circumstances, they were justified in believing that appellant had granted him the authority to act as a houseparent. That Earl Pearson had never been granted the actual authority to do so does not prevent the existence of an agency relationship between him and appellant, and does not relinquish appellant's responsibility for his acts, provided, of course, that appellant had the requisite knowledge of those acts.

## IV. *Instructional error as to the substantive tort of negligent supervision*

Appellant argues that the trial court erroneously refused its proposed instruction No. 43, which set forth appellant's definition of the "notice" which, appellant argued, must be proven in order to give rise to a defendant's duty under this tort.[17]

The special verdicts contained only one question relating to negligence: "Was the Masonic Homes of California negligent in the hiring, training, retention or supervision of its employees, agents, volunteers or representatives with respect to any sexual abuse of Nancy Deutsch by Earl Pearson?" An identical question was asked concerning the sexual abuse of Mohr-McDermott by Earl Pearson and of Deutsch by Azelton. Over appellant's objections, the instructions did not include "notice" as an element of this cause of action. Appellant argues that this was prejudicial error requiring reversal. Respondents counter that the trial court correctly refused to give appellant's proposed instruction that appellant was required to have "actual knowledge" or a "specific warning" that the perpetrators had engaged in unlawful sexual conduct, and properly ruled that "the standard to be used is actual or constructive knowledge."

The cases cited by the parties support respondents' position that the standard for negligent hiring or supervision is generally in accord with the Restatement Second of Agency, section 213, which allows for liability of a principal for the acts of his agents where the principal is either negligent or reckless in the hiring or supervision of the agent.[18] (Rest.2d Agency, § 213, coms. b, c, pp. 458, 459.) (*Evan F. v. Hughson United Methodist Church* (1992) 8 Cal.App.4th 828, 842 [10 Cal.Rptr.2d 748].) As explained in comment d, "If liability results it is because, under the circumstances, the employer has not taken the care which a prudent man would take in selecting the person for the business in hand. . . . [¶] . . . [¶] Liability results . . . not because of the relation of the parties, but because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment." (Rest.2d Agency, §213, com. d, p. 459.) Thus, the "actual notice" or "specific warning" instruction offered by appellant was not a

---

[17] In addition, appellant claimed that the trial court erred in instructing the jury on the question of respondeat superior liability. We conclude that appellant forfeited this claim of error by failing to timely object at trial; therefore we will not discuss it.

[18] The Restatement Second of Agency has been superseded by the Restatement Third. However, the Restatement Second was current through August 2007, therefore it was the applicable treatise during the trial of this matter, which took place in October 2006.

correct statement of the law of the tort of negligent hiring or supervision, and was properly refused by the trial court.[19]

## V. *Remaining issues*

Our decision that the trial court's instructional error as to the notice element of section 340.1(c) requires reversal for a new trial of the matter renders moot appellant's claims of error regarding (1) inconsistency of the verdicts; (2) the damages verdict; and (3) false evidence. Therefore, we do not address these issues.

## DISPOSITION

Because we have determined that the trial court erroneously instructed the jury on the notice necessary to revive a lapsed claim under Code of Civil

---

[19] Many of the cases cited by appellant involve relationships other than "employee, volunteer, representative, or agent" (Code Civ. Proc., § 340.1, subd. (b)(2)), and therefore are not applicable. (See *Johnson v. Casetta* (1961) 197 Cal.App.2d 272 [17 Cal.Rptr. 81] [involving relationship between car salesperson and third person to whom defendants had sold a car]; *Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141 [42 Cal.Rptr.3d 519] [involving lawsuit by victim of sexual assault against parent of a friend of the victim, who hosted a sleepover where assailants were present]; *Chaney v. Superior Court* (1995) 39 Cal.App.4th 152 [46 Cal.Rptr.2d 73] [involving lawsuit by victim of sexual assault against perpetrator's wife]; *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068 [107 Cal.Rptr.2d 801] [involving lawsuit by victim of sexual assault against parents of a friend in whose home victim was sexually assaulted by third party teenaged boy]; *Pamela L. v. Farmer* (1980) 112 Cal.App.3d 206 [169 Cal.Rptr. 282] [involving lawsuit brought by three minor girls against wife of perpetrator for negligence].) These cases are distinguishable because the defendants in these matters did not hold the level of responsibility over the respective perpetrators that section 340.1(c) requires. Appellant further cites *Steven F. v. Anaheim Union High School Dist.* (2003) 112 Cal.App.4th 904 [6 Cal.Rptr.3d 105], involving an action by the parents of a high school girl against the school district for damages resulting from their daughter's sexual relationship with a teacher, as illustrating the type of nonspecific or ambiguous information that is insufficient to place a nonperpetrator on notice. However, the *Steven F.* court stressed that the opinion should not be read for any proposition involving negligent hiring or supervision, but made the assumption that such negligence existed in order to "to underscore the inability of the student's *parents* to recover for *their own* emotional distress when the relationship came to light." (*Id.* at pp. 910–911.) It therefore does not support respondents' position regarding the appropriate standard of notice for negligent hiring or supervision. Appellant also cites *Juarez v. Boy Scouts of America, Inc., supra,* 81 Cal.App.4th 377, for the proposition that "actual knowledge" is required of prior unlawful sexual conduct by the assailant. However, *Juarez* cited *Evan F. v. Hughson United Methodist Church, supra,* 8 Cal.App.4th at page 843, for the proposition that "in California, an employer can be held liable for negligent hiring if he knows the employee is unfit, or has reason to believe the employee is unfit or fails to use reasonable care to discover the employee's unfitness before hiring him. [Citations.]" This statement of the law is in accord with the *Evan F.* court's citation to the Restatement Second of Agency, section 213, which allows for liability of a principal for the acts of his agents where the principal is either negligent or reckless in the hiring or supervision of the agent. (Rest.2d Agency, § 213, coms. b, c, pp. 458, 459; *Evan F., supra,* at p. 842; see also *Roman Catholic Bishop v. Superior Court* (1996) 42 Cal.App.4th 1556, 1565 [50 Cal.Rptr.2d 399].)

Procedure section 340.1, and that such error caused prejudice, we reverse and remand for a new trial. Each party is to bear its own costs on appeal.

Doi Todd, Acting P. J., and Ashmann-Gerst, J., concurred.

A petition for a rehearing was denied July 23, 2008, and appellant's petition for review by the Supreme Court was denied September 17, 2008, S165610.